# CHICAGO, BURLINGTON & QUINCY RAILWAY COMPANY v. EDWARD J. GILDERSLEEVE, Appellant.

**In Banc, April 13, 1909.**

1. **CIRCUIT COURT: Common Law Powers.** The circuit court of St. Louis, as all other circuit courts, is created, not by the Legislature, but by the Constitution. It is a court of general jurisdiction, proceeding according to the course of the common law.

2. ————: ————: **Contempt.** The right to punish for contempt is inherent in every constitutional court having common law powers, and such a court cannot be shorn of those powers by the Legislature.

3. ————: ————: ————: **Regulation by Legislature.** Where the court is a creature of the Legislature and not of the Constitution, the Legislature has power to regulate the court's power in contempts and to limit the punishment.

4. ————: ————: ————: ————: **Constitutional Court.** Since the Constitution expressly provides that powers belonging to courts created by it shall not be exercised by the executive or legislative departments of government, except in the instances in the Constitution expressly directed and permitted, and since the Constitution nowhere expressly or impliedly undertakes to regulate or limit the powers of constitutional courts to punish for contempt, the inherent judicial power of such a court to punish contempts cannot be shorn, limited, abridged or regulated by the Legislature.

5. ————: **Respect to Legislature: Declaring Statute Unconstitutional.** It is from no want of respect to the Legislature that the courts maintain the powers which the people by their Constitution have conferred upon them. The Constitution is the supreme law for the Legislature and the courts created by it alike, and in declaring any act of the Legislature to be unconstitutional the court does not proceed upon any theory of its superiority over the Legislature, but simply adjudges that it will follow the organic law, which created both the court and the Legislature, and declared that the powers properly belonging to either shall not be exercised by the other except in the instances enumerated by it.

6. ————: **Contempt: Unlimited Power to Punish.** The power vested in a constitutional court to punish contempts is arbitrary, but it is necessary and inherent, and it is not to be denied or taken away because it is unlimited and may be abused.

7. ———: ———: **Punishment In Excess of Statute: Constitutionality.** The Legislature, in prohibiting the circuit courts by statute (Sec. 1617, R. S. 1899) from imposing a fine in any case of contempt in excess of fifty dollars and in limiting the imprisonment to ten days, exceeded its constitutional powers; and the circuit court in imposing a fine of three hundred dollars and an imprisonment in jail for thirty days, exercised its inherent constitutional right, and its judgment is approved.

BY LAMM, J., IN A DISSENTING OPINION IN WHICH WOODSON AND GRAVES, JJ., CONCUR.

1. **POWERS OF LEGISLATURE.** The General Assembly has power to legislate upon any subject not forbidden by express provision of, or by inexorable implication in, the Constitution.

2. **CONSTITUTIONALITY OF STATUTE: Practice of Courts.** It is a cardinal principle that courts, from high regard for legislative wisdom and out of comity to the lawmaker, will not declare a statute unconstitutional unless it be put beyond reasonable doubt that it is so, but will solve all doubts in favor of the statute, and will not strike it down if it can be sustained by any recognized canon of interpretation.

3. ———: **Old Statute: Contempt.** Some veneration and efficacy are due the contempt statute because of its age, being enacted in 1835, and since accepted as a reasonable limitation upon the otherwise unlimited and unregulated power of courts, by their fiat, summarily, without jury, without change of venue and (in some cases) without right of appeal, to punish a citizen for contempt by an unlimited fine or an unlimited jail sentence.

4. ———: **Limiting Powers of Courts to Enforce Decrees: General Rule.** It is the general doctrine that a statute which limits the amount of the fine or term of imprisonment which courts may impose, does not deprive them of their powers to enforce affirmatively their orders or decrees, whether affirmative or otherwise, which may be passed upon the final hearing of the cause.

5. ———: **Courts: Inherent Powers: Contempt.** Admitting that the circuit court was created by the Constitution, that it is a court of general common law jurisdiction and powers, and that its powers are inherent and cannot be shorn or whittled away by legislative act, yet inherent power does not mean entirely beyond reasonable legislative regulation; and it is not abridging or interfering with a proper exercise of that power to limit the punishment in contempts.

Railroad v. Gildersleeve.

6. ———: ———: ———: ———: Common Law Powers: Annulled. Not the whole body of the common law was adopted in this State, but only that portion of it not repugnant to or inconsistent with the Constitution of the United States, or of this State, or the statute laws in force for the time being; and even if courts at common law had the unregulated, arbitrary and whimsical power to not only fine or imprison as a punishment for contempts, but an unbridled power to fix the amount of the punishment—a power that will not brook a temperate or reasonable control—that part of the common law is contrary to the genius of our institutions and the policy of the Constitution and the statutes.

7. ———: ———: Regulation. The power to regulate does not in all cases mean the power to destroy. To regulate a court is not to destroy it. To limit within reasonable bounds the punishment which a court may impose for contempts is not to destroy the court's inherent power to punish contempts.

8. ———: ———: ———: Arbitrary Powers. A constitutional court of common law power may not be shorn by a statutory enactment of the right to punish for contempt; but either as a matter of comity or of right, the Legislature may, within reason, somewhat regulate that power so that an arbitrary judicial discretion may not run riot, rampant or wanton.

9. ———: ———: ———: Statute: Section 1617. Section 1617, Revised Statutes 1899, fixing the maximum punishment for contempts at a fine of fifty dollars or ten days' imprisonment, or both, was and is a reasonable regulation of the common law power of a constitutional court, is in no wise hostile to the inherent power of such court to punish contempts, and is not, therefore, unconstitutional.

Transferred from St. Louis Court of Appeals.

Affirmed.

*Chester H. Krum* for appellant.

Appellant presents one question for the consideration of this court. Appellant was adjudged guilty of contempt and sentenced to imprisonment "in the common jail in the city of St. Louis for the period of thirty days, or until he shall be discharged according to law." This judgment was void, because in excess of the term of imprisonment authorized by the statute.

Sec. 1617, R. S. 1899, provides that in contempt cases a fine shall not exceed fifty dollars, nor a term of imprisonment over ten days; and, when one is committed for non-payment of a fine, he shall be discharged at the expiration of thirty days. Here appellant was not fined, but was imprisoned, not for ten days or less, but for thirty days, under one of the alternatives of the judgment. It is manifest that, in this respect, the judgment is void, as being in excess of the authority conferred by the statute.

*Edward S. Robert* and *Douglas W. Robert* for respondent.

(1) Appellant has not complied with the statute and rules of this court as he has failed to file a printed abstract of the entire record or a clear and concise statement of the case. R. S. 1899, secs. 813-863; Rules 15 and 19; Isaac v. Lumber Co., 47 Mo. App. 30; Roth v. May, 80 Mo. App. 300; McCullom v. Ulen, 87 Mo. App. 606; Ladd v. Williams, 100 Mo. App. 51. (2) Sec. 1617, R. S. 1899, which attempts to limit the power of the court to punish for contempt, is unconstitutional. State ex inf. v. Shepherd, 177 Mo. 205; State ex rel. v. Ryan, 182 Mo. 349. (3) The words "or until he shall be discharged according to law" added to the sentence do not render the commitment void. Ex parte Kenney, 105 Mo. 535; Ex parte O'Brien, 127 Mo. 487; Kelley on Justices, secs. 768-815; Pattison's Mo. Form Book, secs. 291, 661, 705; Appendix R. S. 1899, Forms 127, 128, pp. 30, 31; R. S. 1899, secs. 1617, 2432, 2775, 2897; Railroad v. Gildersleeve, 114 Mo. App. 294; Rapalje on Contempt, Form XVIII, p. 252; In Re McAdam, 5 N. Y. Supp. 387; State v. Bridge Co., 16 W. Va. 890; In Re Rosenberg, 90 Wis. 581; Ex Parte Whitmore, 9 Utah 441; Mason v. Haile, 12 Wheat. (U. S.) 370; Ammidon v. Smith, 1 Wheat. (U. S.) 447. (4) The most that can be claimed is that the addition of

those words is a mere irregularity and if it is so, this court will strike them out. R. S. 1899, sec. 2720; In Re Bouquette, 14 Mo. App. 576; Ex parte Kenney, 105 Mo. 535; State v. Bockstruck, 136 Mo. 335; In Re Knaup, 144 Mo. 665.

GANTT, J.—This case has been certified to this court by the St. Louis Court of Appeals for the reason that a constitutional question, to-wit, the validity of section 1617 of the Revised Statutes of Missouri of 1899, is necessarily involved in the judgment rendered by the circuit court of the city of St. Louis.

It appears from the abstract of the record that the appellant, Edward J. Gildersleeve, had been enjoined on the 12th day of July, 1903, by the circuit court of the city of St. Louis from buying, selling, dealing in or soliciting the purchase or sale of any mileage passenger tickets or any part thereof, or the return coupon thereof or any part thereof, or any excursion passenger ticket or any part thereof, at that time or thereafter issued or sold, or which might thereafter be issued or sold, by the plaintiff for passage over its railroad, or issued by any other railroad for use over plaintiff's road, or any part thereof, where such ticket was sold, or where it appeared upon such ticket, coupon or return ticket, that the same was issued or sold, below the regular schedule rate, under a contract with the original purchaser, entered upon the said ticket and signed by such original purchaser, that such ticket was non-transferable and void in the hands of any other person than the original purchaser, and also from soliciting, aiding and encouraging or procuring any person other than the original purchaser of such ticket to use or attempt to use the same for passage on any train or trains of the plaintiff. And that afterwards a citation had issued out of the said circuit court on the first day of October, 1904, against the said defendant, Edward J. Gildersleeve, commanding him to

appear before said court and show cause why he should not be adjudged guilty of contempt for violating the order of injunction issued as aforesaid.

It appears that said citation had been duly served upon the said Gildersleeve on the first day of October, 1904, and the said matter coming on for hearing on the 19th of October, 1904, and the court having heard the evidence and duly considered the same, adjudged the said Gildersleeve guilty of contempt, in that he had violated the said injunctive order, and by its judgment adjudged that he be committed to and imprisoned in the common jail in the city of St. Louis for a period of fifteen days from the 29th day of October, 1904, to the 13th day of November, 1904, and that he pay the costs of the said proceedings. Within four days the said Gildersleeve filed his motion for a new trial, which was overruled and he excepted and appealed to the St. Louis Court of Appeals, and that court has certified the same to this court.

Two other cases, to-wit, The Chicago & Alton Railway Co. v. Gildersleeve, and the Chicago, Burlington & Quincy Railway Co. v. Gildersleeve, were submitted along with this case and involve the same question. In the Chicago & Alton case the fine imposed for the contempt was three hundred dollars, and in the Chicago, Burlington & Quincy Railway case the sentence was thirty days in jail.

I. But one question is raised on these appeals by the defendant, to-wit, that the circuit court in each of said cases exceeded its lawful powers as defined by section 1617, Revised Statutes 1899, which is in these words: "Punishment for contempt may be by fine or imprisonment in the jail of the county where the court may be sitting, or both, in the discretion of the court; but the fine in no case shall exceed the sum of fifty dollars nor the imprisonment ten days; and where any person    shall    be    committed    to    prison    for

the non-payment of any such fine, he shall be discharged at the expiration of thirty days." If this is a valid constitutional enactment, it is obvious that the judgment must be reversed. If, on the other hand, the Legislature exceeded its constitutional powers in abridging and impairing the power of the circuit court to punish contempts of its judgments and decrees, then the judgments must be affirmed.

The learned counsel for the appellant, Gildersleeve, goes to the root of the matter by insisting that the circuit court of this State has not and never had any inherent common law jurisdiction, but is subject to legislative control and its powers are such, and such only, as the Legislature shall see fit to prescribe.

Article three of the Constitution of Missouri (1875) provides: "The powers of the government shall be divided into three distinct departments—the legislative, executive and judicial—each of which shall be confided to a separate magistracy, and no person, or collection of persons, charged with the exercise of powers properly belonging to one of those departments shall exercise any power properly belonging to either of the others, except in the instances in this Constitution expressly directed or permitted."

Article 6, section 22, creating circuit courts, is as follows: "The circuit court shall have jurisdiction over all criminal cases not otherwise provided for by law; exclusive original jurisdiction in all civil cases not otherwise provided for; and such concurrent jurisdiction with and appellate jurisdiction from inferior tribunals and justices of the peace as is or may be provided by law. It shall hold its terms at such times and places in each county as may be by law directed; but at least two terms shall be held every year in each county."

Article 6, section 27, creating the circuit court of the city of St. Louis, is as follows: "The circuit court

of St. Louis county shall be composed of five judges and such additional number as the General Assembly may from time to time provide. Each of said judges shall sit separately for the trial of causes and the transaction of business in special term. The judges of said. circuit court may sit in general term, for the purpose of making rules of court, and for the transaction of such other business as may be provided by law, at such time as they may determine, but shall have no power to review any order, decision or proceeding of the court in special term."

The circuit court of the city of St. Louis, like all other circuit courts in the State, is to all intents and purposes a court of general jurisdiction, and has been so often adjudged to be such that it would be a waste of time to cite decisions to that effect. As late as In Re Clark, 208 Mo. 121, this court In Banc said: "In the second place, Division 11 is in very fact, as its name indicates, but a division of the circuit court of that city, and, hence, to all intents and purposes a court of general jurisdiction. The mere fact that in matters of detail in the administration of justice certain criminal cases are assigned to it and that such assignment is heavy enough to occupy, peradventure, its whole time, does not lop off or dim its power as a constitutional court—a circuit court proceeding according to the course of the common law." In view of the articles and sections above quoted from the Constitution itself, it is too plain for argument that the circuit court is created, not by the Legislature, but by the Constitution. We all agree, I take it, that the right of punishment for contempt is inherent in every constitutional court having common law powers. And that such courts cannot be shorn of that power by the legislative branch of our State government. As was said by McKean, C. J., in Respublica v. Oswald, 1 U. S. (1 Dallas) 319, "Not only my brethren and myself, but like-

wise all the judges of England, think that without this power no court could possibly exist—nay, that no contempt could, indeed, be committed against us, we would be so truly contemptible. The law upon this subject is of immemorial antiquity, and there is not any period when it can be said to have ceased or discontinued."

The Supreme Court of Indiana, in Little v. State, 90 Ind. 338, most aptly stated the doctrine on this subject in these words: "Courts of justice possess powers which were not given by legislation, and which no legislation can take from them. Judicial power exists only in the courts; it cannot live elsewhere. [Underwood v. McDuffee, 15 Mich. 361; Chandler v. Nash, 5 Mich. 409; Shoultz v. McPheeters, 79 Ind. 373.] There are inherent powers resident in all courts of superior jurisdiction. These powers spring not from legislation, but from the nature and constitution of the tribunals themselves. [U. S. v. Hudson, 7 Cranch 32; Sanders v. State, 85 Ind. 318.] The judiciary is a co-ordinate department of the government, and is not a mere subordinate branch, dependent for existence and power upon the legislative will. Purely judicial powers, inherent in courts as of the essence of their existence, are not the creatures of legislation, and these powers are inalienable and indestructible. Among the inherent powers of a court of superior jurisdiction is that of maintaining its dignity, securing obedience to its process and rules, protecting its officers and jurors from indignity and wrong, rebuking interference with the conduct of business, and punishing unseemly behavior. This power is essential to the existence of the court. . . There is no doubt that the power to punish for contempt is an inherent one, for, independent of legislation, it exists, and has always existed, in the courts of England and America. It is, in truth, impossible to conceive a superior court as existing without such a power."

In Hawkins v. State, 125 Ind. 1. c. 573, the court said: "When a court is created by the Legislature, under the Constitution, all the powers essential to the existence of the tribunal and the due exercise of its powers at once vest in it from the Constitution. Among the powers which vest in a constitutional court, such as our circuit courts, is that of maintaining its existence and dignity by punishing those who assume to treat it with contempt. This power, as has been often held, is an inherent one and exists independently of statute. The Legislature cannot take away from a constitutional court the power to punish for contempt, since that would make the judiciary subservient to the legislative department and violate the provision which secures the independence of the different departments of government. The Legislature may, within limits, regulate the procedure, but it can not by any regulation abridge or fetter the inherent power itself."

In State ex inf. v. Shepherd, 177 Mo. 1. c. 234, this court, in discussing section 1616, R. S. 1899, said: "If the Legislature had power to abridge or impair the power of this court to punish for contempt, then the defendant in this case could not be held liable. But if the Legislature had no such power, then the section of the statutes quoted is unconstitutional and not binding upon the court. It has already been pointed out in paragraph two of this opinion that the power of this court to punish contempts is inherent, and that statutes which attempt to confer such power have always been treated as conferring no new power, but as simply declaratory of the common law power that already belonged to every court of record. The law is well settled, both in England and America, that the Legislature has no power to take away, abridge, impair, limit, or regulate the power of courts of record to punish for contempts. [Rapalje on Contempts, sec. 11; 7 Am. and Eng. Ency. Law (2 Ed.), 33; Arnold v. Commonwealth,

80 Ky. 300; Middlebrook v. State, 43 Conn. 257; State v. Morrill, 16 Ark. 384; People v. Wilson, 64 Ill. 195; Ex Parte Robinson, 19 Wall. (U. S.) 505; Worland v. State, 82 Ind. 49; Cheadle v. State, 110 Ind. 301; Holman v. State, 105 Ind. 513; Matter of Shortridge, 99 Cal. 526; People v. Stapleton, 18 Colo. 568; In Re Chadwick, 67 N. W. 1071; Hawes v. State, 46 Neb. 149; Hale v. State, 55 Ohio St. 210.]''

In commenting upon the Shepherd case, in In Re Clark, supra, among other things it was said: ''This court [in that case] in effect ruled that a constitutional court may go to the common law for its inherent power to punish all contempts recognized as such at the common law; and to the extent that the statute clipped such power it was unconstitutional. That holding was right; but that case did not hold in judgment and, hence, is no authority for 'the proposition that those parts of the statute declarative of the common law were invalid as unconstitutional.''

As this whole question was so exhaustively discussed and treated in State ex inf. v. Shepherd, 177 Mo. 205, we deem it entirely unnecessary to again enter upon the field of argument and authority to maintain the power of a constitutional court, such as the circuit court, to punish contempts. Indeed, as to this general power, we do not understand that there is any difference of opinion among us upon the main proposition. But some of our brethren, while holding that the right of punishment for contempt is inherent in every constitutional court in the very nature of things, and that such courts can not be shorn of that right by the legislative branch of the government, are of the opinion that the Legislature may make what they term reasonable rules regulating the discretion of constitutional courts in administering punishment for contempt. This question was also considered by this court in State ex inf. v. Shepherd, and it was there said: ''In Wyatt v. People, 17 Colo. 261, the court said: 'Though the

Legislature cannot take away from the courts created by the Constitution the power to punish contempts, reasonable regulations by that body touching the exercise of this power will be regarded.' But this, it must be observed, leaves it to the courts to decide whether or not the regulations that may be prescribed are reasonable, and also proceeds upon lines of comity between the courts and the Legislature, and not upon any recognition of the absolute right of the Legislature to enact such regulations. In addition to this, it is now well-settled law in this, as well as in other States, that the courts have nothing to do with the policy or reasonableness of a law, those being legislative and not judicial questions. So that, if it be conceded that the Legislature had any power to regulate the exercise of the inherent power of the court to punish contempts, the court could not refuse to obey the law, because it deemed the regulations unreasonable. However, it is a contradiction of terms to say the power to punish is inherent, but that the Legislature may regulate the exercise. As the Supreme Court of the United States said in Gibbons v. Ogden, 9 Wheat. 1, the power to 'regulate' includes the power to say in what cases the right shall be exercised. It is worthy of observation that in only the States of Georgia and Louisiana is power given, by the Constitution of the State, to the Legislature to limit the power of the court to punish for contempt. In all the other States the better opinion is that where the court is a creature of the Constitution, the inherent power to punish contempt cannot be shorn, abridged, limited or regulated. This is the only logical view to take, because by the Constitution (art. 3), the powers of government are distributed between legislative, executive and judicial departments, and it is expressly provided that, 'No person, or collection of persons, charged with the exercise of powers properly belonging to one of these departments, shall exercise any power properly belonging to either of the others,

except in the instances in this Constitution expressly directed or permitted.' And nowhere in the Constitution is the Legislature given any power to meddle with the inherent power of the courts.''

While our brethren cite numerous cases in which the courts of last resort in our sister States have announced the rule of comity for which they contend and in which those courts have recognized a certain amount of legislative control over the subject of contempt of courts, in view of the provision in our own Constitution, which makes the judicial power of this State co-ordinate with that of the legislative department and forbids either to encroach upon the powers of the other, it seems to us that the conclusion reached on this subject in State ex inf. v. Shepherd, supra, is not only logical but unanswerable, and it is from no want of respect to the Legislature that this court maintains the power which the people in the organic law have conferred upon it. The Constitution is the supreme law for the Legislature and the court alike, and in declaring any act of the Legislature unconstitutional this court does not proceed upon any theory of superiority over the Legislature, but simply adjudges that it will follow the organic law, which creates both the Legislature and the court, and is alike binding upon each.

In regard to the Act of Congress restricting the power of the courts of the United States in the punishment of contempts and intended to deprive them of the authority to treat out-door publications of any character as such (4 U. S. Stats. at Large, p. 487, approved March 2nd, 1831), it was said in U. S. v. Holmes, 1 Wall. C. C. 1, by Mr. Justice Baldwin, that this Act of Congress was the limitation upon his powers to punish contempts, but of this decision, it must be remembered that the judicial power of the United States is vested in one Supreme Court and such inferior courts as the Congress may from time to time ordain and establish. [Constitution of the United States, art. 3, sec.

1.]   The Supreme Court was created by the Constitution, the district and circuit courts by Act of Congress. When the latter were established and vested with certain judicial powers, the authority to punish contempts attached as an incident.   [2 Story on Constitution, sec. 1774.]   But deriving their existence from Congress it follows that their power to punish contempts is under its control.   The difference between a constitutional court, such as our circuit court, and a purely statutory court, as the circuit and district courts of the United States, is at once obvious.   [Ex parte Robinson, 19 Wall. 505.]

Much stress is laid upon the provision that unless this court shall recognize the provision of the statute upon which the defendant relies in this case as constitutional then the power of the court to punish for contempt is unlimited.   A fear is expressed that the courts will exercise that power in an arbitrary and oppressive manner.   This contention is not new.   In Neel v. State, 4 Eng. (Ark.) l. c. 263, Mr. Justice Scott responded to this proposition as follows:   "The right to punish for contempts, in a summary manner, has been long admitted as inherent in all courts of justice and in legislative assemblies, founded upon great principles, which are coeval, and must be co-existent, with the administration of justice in every country—the power of self-protection.   And it is only where this right has been claimed to a greater extent than this, and the foundation sought to be laid for extensive classes of contempts, not legitimately and necessarily sustained by these great principles, that it has been contested. It is a branch of the common law brought from the mother country and sanctioned by our Constitution.   The discretion involved in the power is necessarily, in a great measure, arbitrary and undefinable, and yet the experience of ages has demonstrated that it is compatible with civil liberty and auxiliary to the purest ends of justice, and to the proper exercise of the legislative

functions, especially when these functions are exerted by a legislative assembly." Chief Justice WATKINS, in Cossart v. State, 14 Ark. 1. c. 540, said: "The power of punishing summarily and upon its own motion contempts offered to its dignity and lawful authority, is one inherent in every court of judicature. The offense is against the court itself; and if the tribunal have no power to punish in such case, in order to protect itself against insult, it becomes contemptible, and powerless also in fulfillment of its important and responsible duties for the public good. It is no argument that the power is arbitrary, though indeed settled by precedents or limited by them as rules for the future guidance of the courts. While experience proves that the discretion, however arbitrary, has never been liable to any serious abuse, it would be a sufficient answer to say that the power is a necessary one and must be lodged somewhere. And it is properly confided to the tribunal against whose authority or dignity the offense is committed."

And so in U. S. v. Hudson, 7 Cranch 32, it was held that "certain implied powers must necessarily result to our courts of justice from the nature of their institution. To fine for contempt; imprison for contumacy; enforce the observance of order, etc., are powers which cannot be dispensed with in a court because they are necessary to the exercise of all others, and so far our courts no doubt possess powers not immediately derived from statute."

Our conclusion is that the Legislature, in prohibiting the courts from imposing a fine in any case which should exceed fifty dollars and in limiting the imprisonment for contempt to ten days, exceeded its constitutional powers, and therefore such limitations were unconstitutional and void, and the judgment of the circuit court in this case was not in excess of its jurisdiction and must be and is affirmed.

*Valliant, C. J., Burgess* and *Fox, JJ.,* concur; *Lamm, Woodson* and *Graves, JJ.,* dissent, and express their views in an opinion by *Lamm, J.*

## DISSENTING OPINION.

LAMM, J.—Prepared on assignment as a principal opinion, it failed to receive the concurrence of a majority of my brethren, and the case was reassigned to my learned brother Gantt. Something of substance, I think, is to be said against the conclusion reached by him, which justifies resubmitting this opinion as a, dissenting one.

Gildersleeve was sentenced by the circuit court of St. Louis to the common jail for thirty days as a result of a trial in a contempt proceeding. The citation was issued in a civil suit then pending. He was charged with an "out of doors" or constructive contempt in violating a preliminary order of injunction issued by said court, and which injunction forbade the sale of certain kinds of railroad tickets as a ticket broker or "scalper."

On appeal to the St. Louis Court of Appeals, the cause was transferred to this court on a constitutional point arising on the whole case, *viz.*: By Revised Statutes 1899, section 1617, in providing for the punishment of contemners (found guilty under preceding sections) by fine or imprisonment in the county jail, or both, in the discretion of the court, it is ordained as follows: "But the fine in no case shall exceed the sum of fifty dollars nor the imprisonment ten days. . ."

It will be seen at a glance that if that statute be a valid and constitutional limitation on the power of a circuit court in Missouri, then the judgment appealed from, being in excess of the power of the court, is bad. To the contrary, if the statute be unconstitutional in that regard and if the circuit court could go to the common law for the limitation, if any, on its power in

meting out punishment, as it did go, then (the merits not being here for review) the conviction is well enough.

It is not deemed useful to enter upon a general exposition of the reasons underlying the right to punish contemners. That field is a fruitful and inviting one for judicial exploration and eloquence, and, we may add, *dicta*. It has been explored more than once by this court and much has been written—*e. g.,* in Ex parte Crenshaw, 80 Mo. 447; in State *ex inf.* v. Shepherd, 177 Mo. 205; in State *ex rel.* v. Bland *et al.,* 189 Mo. 197; in *In re* Clark, 208 Mo. 121, and in other cases.

The philosophy lying at the root of the right of a court of justice to punish contempts is well stated by Judge DADE to be (Commonwealth v. Dandridge, 2 Va. Cas. 408) that:

"In this country we know no privileges but such as exist for the public good; many such privileges we have; from those which appertain to the Legislature itself even down to such as belong to the lowest executive officer. Those which surround the administration of justice belong to the same order. Courts, their officers, and process, are shielded from invasion and insult, not from imaginary sanctity in the institutions themselves, or the persons of those who compose them (as in the political and ecclesiastical establishments of another hemisphere), but solely for the purpose of giving them due weight and authority, and to enable those who administer them to discharge their functions with impartiality, fidelity and effect. This is the true test of every privilege not granted by statute, and is the spirit of every one (not merely private) which is so secured. The political character of the judiciary, and the tendency of the duties which are devolved upon it, have rendered it necessary to invest it with a considerable share of these privileges. It is confessedly the weakest branch of all governments,

Railroad v. Gildersleeve.

wielding neither wealth, force, nor patronage.  Its duties consist in adjusting and settling the contested rights of individuals, in controlling their turbulence, and punishing their crimes.  These duties are often of a severe and rigorous character, and they are generally to be discharged in almost immediate contact with those on whom they act;  their exercise will frequently elicit the angry passions, or excite unworthy and sinister attempts to bias or avert their operation; and where there is little real power, and no patronage, a certain degree of external dignity may have been considered necessary to supersede a too frequent resort to the actual powers of the courts.''

In Respublica v. Oswald, 1 Dallas 319, Chief Justice McKean, in delivering the judgment of the court, said to Oswald (brought to bar):

''Some doubts were suggested, whether, even a contempt of the court was punishable by attachment; but not only my brethren and myself, but likewise all the judges of England, think that without this power no court could possibly exist.  Nay, that no *contempt* could indeed be committed against us, we should be so *truly contemptible*.  The law upon the subject is of immemorial antiquity, and there is not any period when it can be said to have ceased, or discontinued. On this point, therefore, we entertain no doubt.''

Indeed, so manifest is it that the stream of justice must be kept pure from contamination at its source, and that the judge of a court, jurors, witnesses and officers should be shielded from the humiliation of insult, the terror of violence or itching desires or sinister attempts to improperly influence the one or the other—that the majesty of the administration of law should find its prototype in the gravity and dignity of a court-room free from the belittlement of contemptuous indecorum—and that trials should be conducted and the decrees, orders and judgments of the courts of a free people should be carried into execution without molesta-

tion or interference, unawed by power, unfrightened by intimidation, unemasculated and unperverted by corruption—we say all these things are so manifest that it has become accepted doctrine everywhere that the right of punishment for contempt is inherent in every constitutional court having common law powers, in the very nature of things, and that such courts can not be shorn of that right by.the legislative branch of the government. It is an inalienable right in a court, of the very essence of its being, one that it may not ignore or allow to be clipped away if it would. These are hornbook propositions asserted by all text-writers, laid down by all courts and worthy of all acceptance by intelligent men as of course, hence need no citation of authority to sustain them at this day.

But the question presented here is different and deeper. It is this: May the lawmaker make a rule reasonably regulating the discretion of constitutional courts in administering punishment for contempt?

Attending to that question, it may be said that legislation of that character is believed to exist in every State in the Union and finds a place in the acts of Congress and in those of the British Parliament. The Federal act owes its origin to an early Missouri event of historical significance. Judge Peck, presiding in the District Court of the United States for the District of Missouri, in 1826, decided an important land case. Mr. Lawless, an attorney in the case, published a criticism of the opinion, not impugning the motives or charging corruption upon the judge, but discussing the correctness of his decision and pointing out its errors. This publication was treated by Judge Peck as a libel, and its author was punished for contempt of court. Mr. Lawless, not content, took the matter to the House of Representatives. Judge Peck was impeached, subsequently tried in the Senate, and acquitted by a vote of 21 to 22. The public discussion of the law and nature of contempts, incident to the trial, doubtless led to the

passage of the Federal Act placing a limit on the power to punish for contempt. [State v. Morrill, 16 Ark. l. c. 405-6.] Whether the same event and the public discussion arising thereon moved the General Assembly of our State to adopt a statutory regulation, we do not know. But, as it was enacted in 1835 (R. S. 1835, p. 160-1), presumably it owed its origin to that source. Doubtless, too, the legislation of the older States may be similarly traced, and that of the newer ones was borrowed from the older.

The idea dominating that character of legislation is (to borrow the quaint and pointed phrase of Coke) that the punishment of a citizen shall not be measured "by the crooked cord of the discretion of the judges," but shall be "measured by the golden metewand of the law"—the obsolete word, "metewand," meaning, we take it, a statutory footrule, yardstick or measuring rod.

In this connection it may not be amiss to recall Lord CAMDEN's oft-quoted, sour yet keen and graphic characterization of uncontrolled judicial discretion, when Chief Justice of the Court of Common Pleas in the trial of Hindson and Kersey, viz.: "The discretion of a judge is the law of tyrants; it is always unknown; it is different in different men; it is casual, and depends upon constitution, temper, passion. In the best, it is oftentimes caprice; in the worst, it is every vice, folly and passion to which human nature is liable." [See editor's note to Proceedings against R. Thompson, 8 How. St. Tr. 58].

Speaking to a point somewhat kindred, Judge TAFT in City of Detroit v. Railroad, 54 Fed. 1 (19), says that where "influences of a personal nature are present, we must presume a human weakness in all judges to prevent injustice from the frailty of the few."

In determining the question of the unconstitutionality of the statute under review care should be taken to steadily keep in mind the precept that our Legisla-

ture has power to legislate upon any subject not forbidden by express provision of, or by inexorable implication in, the Constitution. Care should be taken to see to it that another cardinal principle is obeyed, *viz.*: that courts from high regard for legislative wisdom and out of comity to the lawmaker will not declare a statute unconstitutional unless it be put beyond reasonable doubt that it is so; but will solve all doubts in favor of the law and never strike it down if it can be sustained by any recognized canon of interpretation.

Some veneration, some efficacy withal, is due the statute in hand because of its age. It has been the law of Missouri for three-fourths of a century. During that time Missouri grew from a pioneer State into a great commonwealth; during that time a civil war was waged, the passions of men were lashed into a crest of fury, but through it all its courts of justice, under that statutory limitation of power, deserved and preserved the respect of the citizen and their own self-respect; during that time it was not thought necessary to the public weal that the judiciary should be free to exercise unlimited and unregulated power to punish by their *fiat,* summarily, without jury, without change of venue and (in some cases) without right of appeal, a citizen for contempt by an unlimited fine or an unlimited jail sentence. To the contrary, they accepted the statute as a reasonable limitation, and the joints of the machine of checks and counterchecks under the three co-ordinate branches of State government worked without jar or friction.

Because of a tendency in some courts to comment upon the doubtful propriety and legality of legislative enactments limiting the power of constitutional courts to punish for contempt, at least three States have put in their organic law a provision granting such power to the Legislature, to-wit, Georgia, Louisiana and, lately, Virginia. In other States no such constitutional grant of power is given lawmakers and yet despite that fact

a reasonable regulation—one showing no legislative intent to deny or cripple the inherent power of the courts, and one not attaining that bad end—has been quite uniformly sustained.either out of comity or because of legislative right.   [See authorities, *infra.*]

No doubt is entertained of the legislative power to regulate where the court in question is the creature of the Legislature and not of the Constitution.   This doctrine has been applied to the Act of Congress regulating punishment for contempts in Federal courts.   [*Ex parte* Robinson, 19 Wall. 505].   Their powers and duties are held to depend upon the act calling them into existence, or subsequent acts extending or limiting their jurisdiction, but when the court whose acts are in question is itself the creature of the Constitution then the better doctrine, as said heretofore, is that as such constitutional court it sprang into existence full-armed with all the constitutional powers of a court of justice, one of which is the right to punish for contempt, and that this right in its essence cannot be taken away by the lawmaking power.   However broad the logic of the ruling in the Shepherd case, *supra,* that is what is *decided* by it.

It is contended, in effect, that the Shepherd case declared the whole body of statutory enactments regulating contempt in courts of record unconstitutional and void.   That is no new contention.   It was made once before in this court in *In re* Clark, *supra.*   In answer to that large and drastic proposition it was there said:

"We may digress far enough to point out that it is insisted by him (the circuit attorney) that the scope, effect and purpose of State *ex inf.* v. Shepherd, 177 Mo. 205, was to strike down as unconstitutional the whole body of the written law on the subject of contempts.   [R. S. 1899, sec. 1616, *et seq.*]   But we do not so read that case.   The statute (sec. 1616) enumerates certain forms of contempt and provides that in their

punishment courts have power to punish the acts enumerated, 'and no other.' The contempt charged in the Shepherd case did not come within those enumerated by that statute. The precise question held in judgment in that case, therefore, was this: Was the statute preclusive, or had this court as a creation of the Constitution the inherent power at common law, of which it may not be shorn by statute, to punish as at common law for contempts known to the common law but on which the statute is silent? The broad language used in the case, measured by recognized canons of construction, must be read in the light of the case and facts held in judgment. This court, in effect, ruled that a constitutional court may go to the common law for its inherent power to punish all contempts, recognized as such at the common law; and to the extent that the statute clipped such power, it was unconstitutional. That holding was right, but that case did not hold in judgment and, hence, is no authority for the proposition that those parts of the statute declarative of the common law were invalid as unconstitutional.''

In Koerner v. Car Co., 209 Mo. 156, it was pointed out by GANTT, C. J., that the rule for determining what is actually decided in a case is laid down in 2 Lewis' Sutherland Statutory Construction (2 Ed.), section 486, where that author says:

''The maxim of *stare decisis* applies only to decisions on points arising and decided in causes; it has been held not to extend to reasoning, illustrations and references in opinions. The precedent includes the conclusions only upon questions which the case contained, and which were decided. 'The members of a court,' says DOWNEY, C. J., 'often agree in a decision, but differ decidedly as to the reasons or principles by which their minds have been led to a common conclusion. It is, therefore, the conclusion only, and not the process by which it has been reached, which is the decision of the court, and which has the force of pre-

cedent in other cases. The reasoning adopted, the analogies and illustrations presented in real or supposed cases, in an opinion, may be used as argument in other cases, but not as authority. In these the whole court may concur, or they may not. So of the principle concurred in, and laid down as governing the point in judgment, so far as it goes or seems to go beyond the case under consideration.' ''

Applying those principles to the Shepherd case, it will be seen that the proposition held in judgment was not that all the statutes regulating procedure in contempt were unconstitutional, but that the schedule of acts which go to constitute contempt under the statute did not cover the whole ground—that that part of the statute declaring the acts scheduled in the law ''and no other'' should be deemed contempts was unconstitutional and void, and that the Supreme Court could go to the common law to ascertain other acts constituting contempt and punish for those acts as at common law. So construed, the Shepherd case has been approved twice since and is in line with the great weight of authority elsewhere.

There seems to be an impression abroad that if we sustain the statute on contempts, limiting the *quantum* of punishment, it will result that courts of equity and law will be shorn of their power to specifically enforce their rules, orders, judgments and decrees rendered necessary in rounding out justice. To illustrate: A is ordered to deposit valuable securities in court or turn them over to a receiver, or not to negotiate given negotiable instruments pending a suit affecting them. A refuses to obey the order, rule or judgment. In that condition of things, it has been said that A would willingly pay a small fine of $50 or be subjected to a short term of incarceration of ten days in the county jail rather than obey the order of the court. But the

statutes in hand contemplate no such absurd results. In the original act, after enumerating the different grounds of contempt in one section, after providing for their punishment in another, after providing in another that contempts committed in the immediate view and presence of the court may be punished summarily and that in other cases the parties charged shall be notified of the accusation and have a reasonable time to make a defense, and after making other provisions, the act sets forth (sec. 61, p. 161, R. S. 1835) that: ''Nothing contained in the preceding sections shall be construed to extend to any proceeding against parties or officers, as for contempt, for the purpose of enforcing any civil right or remedy.'' That section has been brought forward as live law and is now section 1620, Revised Statutes 1899.

It will thus be seen that the Legislature wisely left an unimpaired and unfettered power in courts to enforce civil remedies and rights where the rules, orders, judgments and decrees of the court made in that behalf are contumaciously disobeyed, by imprisonment until obeyed. That is the interpretation placed upon the statute by this court in *Ex Parte* Crenshaw, *supra*.

Not only so, but by section 1621, Revised Statutes 1899, as by original act regulating contempts, it is provided that notwithstanding the punishment for contempt by the court, if the act constituting the contempt be indictable, the party charged may be indicted and punished, the court being required to take into consideration, in punishing under the indictment, the punishment before inflicted.

We look in vain, then, into the statute for any legislative intent to impair the dignity of courts of justice or to strip them of their inherent constitutional power to punish for contempt, except on the point rightly decided in the Shepherd case.

Our statutes, therefore, if unconstitutional in other respects must be held so only because they put limita-

tion on the amount of punishment that may be administered by a court for direct or constructive contempt. Are they unconstitutional in those particulars? We think not. This is so, because:

The general doctrine seems to be that "a statute which limits the amount of the fine, or term of imprisonment which the courts may impose, does not deprive them of their power to enforce affirmatively their orders or to enforce any decree, whether affirmative or otherwise, which may be passed upon the final hearing of a cause." [Rapalje on Contempts, sec. 11.]

State v. Morrill, 16 Ark. 384, is a soundly-reasoned case sustaining the inherent common law right of a constitutional court to punish for contempt for acts outside of those enumerated in the statute, yet (as we see it) graciously conceding the legislative power to put reasonable bounds to the amount of the punishment. Suppose for instance, says the court, that the General Assembly were to repeal the act regulating contempts, would any lawyer seriously contend that the courts were thereby deprived of their power to punish contempt? That question as put was held to answer itself and the court proceeded to say that "the Legislature may regulate the exercise of, but cannot abridge the express or necessarily implied powers, granted to this court by the Constitution."

In accord with that pronouncement, the Supreme Court of Indiana held "that the Legislature may regulate the practice in proceedings against persons for an alleged contempt." [Cheadle v. State, 110 Ind. l. c. 309.]

The language of that learned court in Hawkins v. State, 125 Ind. 570, should be construed as in accord with the guarded expression just quoted. That language is: "The Legislature may, within limits, regulate the proceedings (in contempt) but it cannot by any regulation abridge or fetter the inherent power itself."

In Wyatt v. People, 17 Colo. l. c. 261, the law was stated to be that: "Though the Legislature cannot take away from the courts created by the Constitution the power to punish contempts, reasonable regulations by that body touching the exercise of this power will be regarded as binding,"

In Mahoney v. State, 33 Ind. App. l. c. 658-9, it was held that: "While it is not necessary to look after any statute to ascertain whether a particular act does or does not constitute contempt, still, the Legislature may, within limits, regulate the procedure in such cases."

In State ex rel. v. Miesen, 98 Minn. l. c. 20, it was held that: "While Legislature cannot take away from courts created by the Constitution the inherent right to punish contempts, yet it may regulate, within reasonable limits, the exercise of the power."

In Carter v. Commonwealth, 96 Va. 791, it was held: "That the power to punish for contempts may be regulated by the Legislature, but cannot be destroyed or so far diminished as to be ineffectual." In that case the Legislature required a jury trial, which provision the court held void. In treating of the phrase "inherent power" it was said: "This language does not mean, and has never meant, that these powers are held superior to legislative control. It did not mean that at common law."

It will be observed that the Virginia court holds that the phrase "inherent power" did not mean at common law a power entirely beyond legislative control. This is of significance, because the principal opinion in this case treats the power (because *inherent*) as entirely beyond, and independent of, such control. In this connection it is suggestive to note that in the mother country, the ancient seat of the common law, it has been assumed that the power is not an arbitrary and unregulated one. Statutes have been passed by the British Parliament from time to time regulating the

subject-matter of contempts, and (within bounds) these statutes seem to be enforced by the English judiciary. [In Maria Annie Davies, 21 L. R, Q. B. Div. 236.]

It must not be overlooked either that if it be conceded, by way of hypothesis, that the power to punish was unbridled at common law and that the lawmaking power could not regulate it a whit, then we come face to face with the proposition that it is not the whole body of the common law that was adopted in this State, but only that portion of it not repugnant to or inconsistent with the Constitution of the United States, or of this State, "or the statute laws in force for the time being." [R. S. 1899, sec. 4151.]

On the last head, I do not hesitate to say that the unregulated, arbitrary, whimsical power to fine or imprison for contempt, a power that will not brook a mere temperate and reasonable control, is contrary to the genius of our institutions and the policy of our Constitution and statutes.

In Arnold v. Commonwealth, 80 Ky. l. c. 302, it was said: "While the right to punish is with the court, we are not prepared to say that it is not subject in some degree to legislative control; but, on the contrary, we are inclined to adjudge that a mere arbitrary discretion on the part of the judge may be limited; but an attempt by legislation to deprive the courts of the inherent power of protection against assaults and indignities would be disregarded."

In State v. Frew, 24 W. Va. l. c. 458, it is said, after a most exhaustive review of the authorities: "Therefore courts will tolerate the regulation of the power, so that the Legislature does not by such regulation substantially destroy the efficiency of the court. The courts must have just enough power and will exercise it for their own protection, and they want and demand no more. Whether or not the Legislature in its regulation has left sufficient power for the purpose, the court,

which is called to exercise it, must be the sole judge, unless its judgment may be reviewed, and in that case the court of last resort would be the exclusive judge."

In other cases it has been cautiously held that the power to regulate within reasonable bounds to the extent that the regulation does not touch to the quick the dignity of courts and cripple the exercise of judicial functions, was well enough. In other cases regulating statutes have been enforced, as of course, under the doctrine of comity and to beat down all apparent judicial antagonism to the fair and reasonable exercise of legislative power. For example, in *In re* Ida Louisa Pierce, 44 Wis. 411; Batchelder v. Moore, 42 Cal. 412; *Ex parte* Edwards, 11 Fla. 174; *In re* Millington, 24 Kan. 214; People ex rel. v. Grant, 47 Hun 604; People ex rel. v. Jacobs, 66 N. Y. 8; Latimer v. Barmore, 81 Mich. 592; Sloman v. Reilly, 95 Mich. 264; *Ex Parte* Schenck, 65 N. C. 353; Cole v. Egan, 52 Conn. 219; State v. Rust, 2 Tenn. Chan. 181; *Ex parte* Kearby and Hawkins, 35 Tex. Crim. 531. See, also, *Ex parte* Crenshaw, supra.

So delicate is the subject of contempt that courts have been unable to hold an even and uniform voice in dealing with it. Cases may be found that apparently repudiate any legislative approach toward the control of the exercise of the power of punishment, however reasonable it be.

But the doctrine of Chief Justice John MARSHALL in the great case of Gibbons v. Ogden, 9 Wheat. 1, is invoked to sustain the dogma that the power to *regulate* includes and concedes the power to *destroy*. It is argued, as I grasp it, that if the Legislature of Missouri be once conceded the power to regulate the punishment of contempt, thereby the power is conceded to destroy every vestige of such punishment and to strip courts bare of a right inherent to their office. I trust to never be found wanting in unstinted admiration and exalted respect for that illustrious Chief Justice whose govern-

mental doctrines, as expounded in his opinions, I was taught to accept with reverence even from my youth up. But it seems plain that what was said by him in the Gibbons case must be read in the light of the case held in judgment. It dealt with Federal power and sovereignty as over against State power and State sovereignty, and it held the preclusive power to be in Congress to regulate the coasting trade and commerce generally. It must be remembered that the sole right "to regulate" in those particulars was conferred by the Federal Constitution on the Congress and it was ruled that it was taken out of the domain of State legislation. In the evolution of his great argument against a conflict between State and Federal power, even then threatening civil war, he ruled that the Federal power was preclusive and that the hand of State regulation through State laws must be lifted. I take it that it was to the glory of that august tribunal to assert the right to be in Congress in those particulars. But what has that doctrine to do with the power dealt with here? Our Constitution does not grant to courts the preclusive power to regulate themselves as they see fit, including the right to fine and imprison in any sum or for any term for contempt. On the other hand, the public policy of this State in the legislative interpretation put upon our Constitution has been to regulate courts in many ways and those regulations have been uniformly obeyed when reasonable. For example, in sections 1569 and 863, Revised Statutes 1899, this court is told what kind of briefs we may require in cases appealed here. In section 806 our conduct or, more strictly, our discretion, is regulated and we are told that we "shall summarily hear and determine all appeals from orders refusing to revoke, modify or change an interlocutory order appointing a receiver," and we are ordered to advance such case on our docket. So in the Laws of 1907, p. 120, sec. 1a, we are told that when a municipality has undertaken to regulate the

charges of public service corporations and when the reasonableness of those charges is brought in question in an injunction suit and the judgment is appealed, we must speedily hear and determine such cause and must give it precedence over other civil cases. In section 855, our docket is arranged for us by law and we are required to advance certain cases for hearing. Sections 865-6 regulate our discretion in rendering judgments. In section 871, the kind of opinions we shall hand down is regulated. They must be in writing and must show which of the judges delivers them, who concurs and who dissents. By section 872 we are obliged to make a "statement of the case" and, observe, it is to be a statement *"that may be understood."* By section 874, we are stripped of the power to require bonds for costs. Are all these statutes, and many others that might be named, unconstitutional because they impinge on the ancient common law discretion of a full-fledged common law court?

To sum up: From an examination of many cases, well-reasoned and well-bedded in principle, the following propositions lying between two extremes may be deduced as sound doctrine:

(a) *First.* A constitutional court of common law power may not be shorn of the right to punish for contempt by a statutory enactment. That power, in its essence, is ingrained in such a court and becomes a part of its very being.

(b) *Second.* Either as a matter of comity, or of right, the lawmaker may (within reason) somewhat regulate that power so that an arbitrary judicial discretion may not run riot, rampant and wanton. And herein it must be kept in mind that a judge on the bench is, after all, but a human being, and has frailties inseparable from humanity. Therefore, when called to punish for contempt it not infrequently happens that he is smarting under such sense of personal humilia-

tion, indignation or other master emotion, that, at least, a *mote* of prejudice may be assumed as in his eye.

(c) *Third.* The statute under review is a reasonable regulation, in nowise hostile to the inherent power to punish for contempt.

(d) That the power to *regulate* does not in all cases nor in this case mean the power to *destroy.* To regulate a court is not to destroy it.

Finally, let us look at the effect of holding that the arbitrary power of punishment cannot be gently limited (or, if the phrase be preferred, gently *tempered*) by legislative enactment in a constitutional court. The Constitution does not limit it. Among other things it provides (Art. VI, sec. 1) ''That the judicial power of the State as to matters of law and equity. . . shall be vested in a Supreme Court, . . circuit courts, criminal courts, *probate courts, county courts and municipal corporation courts.''* All the aforesaid courts are constitutional courts, and, therefore, not the creature of mere statute. In some of such constitutional courts there is no requirement of law that the individuals acting as judges should be learned in the law. They are taken from unprofessional ranks. Their legal judgment is not rendered sure, steady and staid by a study and comprehension of the principles of jurisprudence. *Is it not a startling proposition to announce that the citizens of this State are subject to an unbridled power in all such tribunals to summarily fine them in any sum, however large, and imprison them for any term, however long, for contempt?* And yet to that complexion we must come if we go to the extreme of holding that a constitutional court may not be controlled by some known, fixed and reasonable rule of written law on the matter.

It is my opinion that the courts of Missouri need no such show of autocratic power. That they, in the future, as in the past, may more surely build their dignity and usefulness solidly on the intelligent respect

of the good citizen, the wise lawmaker and a serene and even administration of justice, seeking (in Lord Mansfield's phrase) "noble ends by noble means," than build it on a show of wielding an uncontrollable power to fine and imprison.

The judgment should be reversed and the cause remanded for further proceedings below.

*Woodson* and *Graves, JJ.,* concur in these views.