STATE, Respondent, v. THE AMERICAN-NEWS COMPANY, et al, Appellants.

(266 N. W. 827.)

(File No. 7526. Opinion filed April 24, 1936.)

See, also, 62 S. D. 456, 253 N. W. 492.

*Hepperle & Fuller*, of Aberdeen, *Morrison & Skaug*, of Mobridge, and *Oppenheimer, Dickson, Hodgson, Brown & Donnelly*, of St. Paul, Minn., for Appellants.

*Geo. H. Fletcher, B. A. Walton, Geo. W. Crane*, and *E. B. Harkin*, all of Aberdeen, for Respondent.

CAMPBELL, J. In January, 1932, and for some time previously, the corporation defendant owned and published three newspapers in Aberdeen, Brown county, this state, being the Aberdeen Morning American, appearing on the morning of each weekday excepting Monday; the Aberdeen Evening News, appearing upon the evening of each weekday; and a combination of the two known as the Aberdeen American-News, appearing upon each Sunday morning. The individual defendants were the managing officers of the corporation having full controll and authority over the publication of all of said newspapers and all their contents, the defendant Mathews (now deceased) being designated as the business manager thereof, and the defendant Anderson being designated as the editor thereof.

In November, 1928, during the incumbency of one Hasse as county auditor of Brown county, two county warrants were issued pursuant to claims previously filed with and allowed by the board of county commissioners, one in the amount of $42.60 to Mary Cooper, and one in the amount of $44.50 to Alfred Abraham. These warrants were never delivered to the payees, and in March,

1931, just a few days before the expiration of his second and last term as county auditor, Hasse forged indorsements upon these two warrants and cashed them. It is stated by defendants that the claims pursuant to which the warrants issued in 1928 were likewise forged by Hasse at that time, but such statement is without support upon the record before us either by admissions of Hasse or by any other proof.

In 1930 and 1931 there was in Brown county a vast amount of personal and political strife and controversy with reference to county offices and county affairs. The air was filled with charges and countercharges of graft, corruption, and fraud in the administration of the county's business by its elected officers. As is always the case in such circumstances, some believed the charges and others did not and the citizens of the county were more or less divided into two opposing camps accordingly. In any event public excitement and interest ran high. A firm of accountants was employed to make a detailed investigation and report of all county affairs for a period of some six years back. The report of the accountants appeared to disclose that the county had been grievously defrauded in a number of its contracts for public works, particularly bridges. Public excitement intensified and there was much clamor and demand for immediate and strenuous action. A grand jury was impaneled and four different individuals were indicted, charged with having defrauded the county in one fashion or another. Defendants in their newspapers were extremely active in the matter and the columns of the papers, both news and editorial, devoted much space thereto. The papers assumed the truth of all charges (and it is entirely possible that such charges may have been true) and were militant crusaders for the taking of prompt and effective measures. It is doubtless impossible at this distance and after this lapse of time to picture the scope and extent of public feeling aroused in the community. Groups of taxpayers and citizens held meetings and passed resolutions. Some of them demanded the immediate resignation or removal of the state's attorney because it was claimed that he was not sufficiently aggressive in connection with desired prosecutions. Defendant Anderson was active in these meetings and was chairman and spokesman for a committee named by one such group to

appear before the board of county commissioners. The columns of defendants' papers were filled with references to "the Brown county graft cases," "the Brown county fraud cases," and "the Brown county bridge fraud cases."

During the course of the investigation above referred to, the accountants discovered the county auditor's forgery of the indorsements upon the two warrants hereinbefore mentioned, such discovery apparently originating from an inquiry addressed to the county treasurer by Mary Cooper, payee in one of said warrants, desiring to know why she had not received payment of her claim against the county. When the county auditor was confronted with the matter, he immediately confessed his guilt, made full restitution to the county of the eighty or ninety dollars involved, and expressed his desire to enter a plea of guilty and take whatever punishment the court might see fit to impose. An information was filed in the circuit court on September 4, 1931, charging him with third-degree forgery, and on the same day he entered his plea of guilty thereto before Hon. Howard Babcock, one of the judges of the Fifth judicial circuit. The court fixed the time for sentence for September 23, 1931, which date was later deferred to January 11, 1932. During the interim, the attorney for Hasse had apparently been endeavoring to secure petitions, letters, etc., testifying to Hasse's previous good conduct and character and like matters, with the apparent design to make use of them at the time sentence was imposed in asking clemency from the court. Of course, such documents were not under our law a proper means or method of seeking leniency for his client. On the morning of Sunday, January 10, defendants wrote and published in their American-News an editorial under the title of "Unadulterated Gall," which commenced as follows:

"Royal Hasse who confessed and pleaded guilty to forgery last September is to receive his sentence tomorrow, according to official announcements. When Hasse entered his plea, sentence was postponed so that in the event other evidences of similar crimes should be revealed when the complete report of the investigation was finally filed, the severity of the sentence might be affected as a consequence."

The article then proceeded to castigate and ridicule Hasse's

attorney for his efforts to secure petitions, letters, and testimonials; quoted at length sections 4959-4961, R. C. 1919, relating to the taking of testimony at the time of imposition of sentence, and ended as follows:

"Hasse has pleaded guilty to the serious charge of forgery. Since his plea was made, more than three months have elapsed.

"If the court wishes to mitigate the sentence, a way is provided in the foregoing South Dakota statutes. The methods employed by Hasse's attorney, however, are in direct violation of these sections, and any citizen falling for his salesmanship may possibly live to fill the air with their vain regrets.

"Moreover, these same unwary and uninformed sympathizers if they write such letters may unwittingly bring about results the very opposite of what they contemplate.

"It is high time that the defendants in these Brown County fraud cases learn that the public is to be no longer fooled—that at least in these cases, there is no chance of the public mistaking mere audacity and bravado for honesty and sincerity."

On the next day, Monday, at the time previously fixed for sentencing Hasse, there appeared in court special counsel who had meantime been employed by Brown county to represent its interests in "these fraud cases" and attend to the prosecution thereof. Special counsel at that time advised the court that he was not satisfied that the act of Hasse in forging the indorsements and cashing the two warrants above referred to (upon one of which he had been informed against and had entered his plea of guilty) was his sole offense during his term as auditor; and that he was not satisfied that there was not a direct connection between Hasse and the frauds claimed to have been worked upon the county in regard to bridge contracts which were involved in the four or five indictments pending in said court against other persons and corporations commonly referred to as "the bridge fraud cases." The trial judge stated in substance that if those suspicions of the special prosecutor were well founded, he desired to know the facts and take them into consideration in imposing sentence, so he again continued the matter until Tuesday, February 2, when he would next have occasion to be in Aberdeen (his place of residence being elsewhere in the circuit). On that day Hasse

and his attorney again appeared before the court, as did the special prosecutor, who introduced a considerable amount of testimony in an effort to prove other criminal acts on the part of Hasse and more particularly to prove some sort of a connection between Hasse and the "bridge fraud cases." This attempted proof did not seem convincing to the trial judge, who stated that he continued to be of the opinion that the case was one of a young man of good family and previous good character and reputation who, for some unexplainable reason, had committed this criminal offense, upon discovery had admitted his guilt and made restitution, and who had already suffered some degree of punishment by exposure to disgrace and loss of standing in the community. Pursuant to that view, he said that he believed the case to be one for some appreciable degree of judicial clemency and orally announced in open court a sentence of six months in the county jail and a fine of $300, service of the jail sentence to be suspended upon payment of the fine and during good behavior. We are not prepared to say from the record before us that this was an unjust or an unwise sentence, or that it was unduly lenient or that it constituted any abuse of judicial discretion. It appears, however, that the special prosecutor and the defendant publishers were grievously disappointed and much irritated thereby.

Judgment in the case against Hasse was not reduced to writing, signed by the court, attested by the clerk, and filed on the day of the court's oral pronouncement, or in fact at all. On the afternoon of that day, however, Hasse surrendered himself to the sheriff, gave the sheriff his check for $300 in payment of the fine, and the sheriff released him. Early the next morning Hasse delivered to the sheriff $300 in cash and the sheriff returned his check to him. On that same morning (Wednesday, February 3) defendants published in the Morning American a lengthy article purporting to be a news account of the proceedings at and prior to the announcement of the sentence. The article recited all the matters attempted to be proved by the special prosecutor; assumed inferentially and in part directly that such proof was complete and successful; assumed and infererred that the suspicion of the special prosecutor had been adequately established as facts; and that Judge Babcock had ignored such facts. Upon the

record, we think that this article was not a fair and impartial report of the proceedings, but was incomplete and misleading.

On the next day (Thursday, February 4) defendants published both in the Morning American and in the Evening News an editorial entitled "A Pat on the Back," which started as follows:

"Although Circuit Judge Howard Babcock is adverse to the term the American-News feels moved to dub his sentence of Royal A. Hasse, confessed forger, a 'mere slap on the wrist'—not at all commensurate with the offense nor consistent with sentences the jurist has meted out for similar crimes by others since he donned the regal robes of justice.

"In an elaborated and lengthy explanation in which he attempted to justify his action, the judge gave reasons for his belief that leniency should have been granted in the Hasse Case.

"Stripped of 'unnecessary and excess verbiage' they were that Hasse had voluntarily confessed (thus saving the county the expense of a trial), that except for a single act of dishonesty just prior to departure from office, he had been an 'honest, capable and efficient officer,' and that a penitentiary sentence was not necessary to 'safeguard the rights of society.' "

The editorial then proceeded at much length to berate and ridicule Judge Babcock for the sentence he had imposed, to compare it unfavorably with other sentences previously imposed by the same judge, and ended as follows:

"The honorable Judge should doff his regal robes, don sackcloth and sit in the ashes until his penitence is complete."

On that day the Brown County Bar Association took cognizance of the matter and appointed a committee to investigate, with authority to file charges if they were of the opinion that a contempt of court had been committed. On February 8 this committee (consisting of three members of the Brown County Bar of standing, ability, and reputation) filed charges in the form of an affidavit based upon the three publications hereinbefore referred to. Upon the filing of this affidavit, Judge Babcock issued a show cause order and an attachment for contempt and then very promptly and very properly withdrew from all further participation in the proceeding, and called in the Honorable J. H. Bottum, judge of the Tenth judicial circuit, to hear and determine the

matter. Defendants moved to discharge the attachment and quash the complaint, which motions were denied, interposed a demurrer, which was overruled, and then answered separately admitting the publication, but denying that the articles were in relation to a pending trial "or were calculated to influence, intimidate, impede or embarrass the court in the trial of any case, or to in any manner prevent a fair and impartial trial of any case," and alleging "that said articles and each of them were printed, published and circulated without any intent, purpose or design to attack the integrity of any court or judge, either generally or in relation to any pending cause; and without any purpose, intent or design to influence public opinion against any court or judge thereof, or to bring it or him into contempt or disrepute; and without any purpose, intent or design to influence, intimidate or coerce any court or any judge in its or his determination of any issue in any pending cause; and without any purpose, intent or design to prevent fair and impartial action by any judge or court in any cause; and without any intent, purpose or design to reflect on any judge or court or others interested in any pending cause or respecting the same; and without any intent, purpose or design to corrupt or embarrass the due administration of justice; and that neither of said articles were calculated to have, or did have, any such effects or results."

Defendant Mathews further pleaded that the articles were published in part during his absence; that he did not see or examine any of them until after publication, and had no personal knowledge of their preparation nor of the printing or publishing thereof until after they had appeared. The corporation defendant and the defendant Anderson further pleaded as follows:

"The defendant further alleges that said articles, and each of them, were published in the full belief of their accuracy and propriety, and after having been advised by competent and reputable counsel that they did not, nor did any of them, constitute contempt."

Upon the issues thus joined the matter came on for trial. A considerable amount of testimony was introduced, including, in addition to the particular publications forming the basis of the contempt charges, several editorials and news items appearing in

the files of defendants' papers at various dates between August, 1931, and January, 1932, relating to "the court house gang," "the gang of grafters that has been robbing Brown county," and to various civil and criminal actions resulting from the audit and investigation of the accountants.

Judge Bottum found that the publications complained of were willfully contemptuous; that the news report of February 3 was not a true and correct statement of the proceedings had at the time of imposition of sentence in the Hasse case and was intentionally erroneous; that said publications were made while the case of State v. Hasse was still pending and were made with the intent and purpose to intimidate and insult the circuit court of Brown county and the judges and officers thereof, and with the intent and purpose to impede, embarrass, and obstruct said court in the due administration of justice in the Hasse case and in other cases then pending before the court. The learned trial judge concluded that the defendants were guilty of contempt and had not purged themselves thereof, and entered judgment accordingly, fining each of the defendants the sum of $200 and imposing a thirty-day jail sentence upon the defendants Mathews and Anderson and suspending service thereof.

From this judgment and from a denial of their application for new trial, the defendants have appealed to this court. Motion to dismiss the appeal was denied (State v. American-News Co. [1934] 62 S. D 456, 253 N. W. 492), and the case was thereafter orally argued and submitted on the merits.

No good citizen in his thinking moments wishes the judiciary of his state to render decisions pursuant to the desires of the majority or the clamor of the moment as distinguished from established law and good conscience. He certainly would not want any court to decide a case of his on any such basis. It is important to the continuance of orderly government and to the social well-being of any people that their courts (and the judges thereof in their official capacities) be accorded respect. It is equally important that the courts and the judges should earn and deserve such respect. Neither the courts nor the judges are sacrosanct, however, or immune from criticism, nor should they be, and it is doubtless impossible to exaggerate the importance, particu-

larly under a form of government such as ours, of maintaining a free, independent, and untrammeled press. As stated by a recent writer (Siebert, "The Rights and Privileges of the Press," Appleton-Century Co. 1934, Preface VII):

"The battles for a free Press are a part of the march of democracy. From complete strangulation by an autocratic monarchy in England in the seventeenth century the Press has risen through heroic efforts to occupy a distinguished and necessary place in our form of government. Increased freedom and privileges were secured during the eighteenth and nineteenth centuries from legislatures and courts. As the people became enfranchised, the Press has been made free. In return it has been the duty of the Press to protect the public by bringing the activities and officials of government to the bar of public opinion through the publication of accurate facts and enlightened comment."

The need for a free and unfettered press is perhaps more urgent in this country today than ever it has been before, although we venture to think that it is not by the judicial department of government that freedom of the press or of speech is most threatened in the present era. Freedom, nevertheless, is not synonymous with utter and unlimited license. There are few topics of the law more controversial than that which deals with the power of courts of justice to punish summarily for contempts by publication. The reason is well stated by a writer in 20 Ill. Law Rev. 191, as follows:

"In every contempt proceeding, of course, there comes into conflict two vitally important social interests: first, the social interest that justice be fearlessly and impartially administered and that the courts be unembarrassed in executing their judgments and decrees; secondly, that fair comment may be indulged in by the public on the reasoning in the opinion as well as the judgment itself, for this fair comment is one of the great safeguards against judicial tyranny and a poor quality of judicial decisions."

Or as it is put by another writer (Thomas, "Problems of Contempt of Court," Baltimore, 1934, p. 21):

"The clash between the judiciary and the citizen as to the punishment of contemptuous publications is primarily a clash of ideals, the citizen being impelled by his psychological reactions to

the term 'freedom of the press' and by his realization of the centuries-old struggle against despotism for this valued right, while the jurist's only consideration is the sacredness of the judiciary, and the principle that private rights are subordinate to the public welfare."

No judge can hope always to be right, or to deserve or receive universal agreement with his views. He should expect, and ought not to resent, honest criticism thereof and fair comment thereon; but when that criticism passes to the point of vituperative abuse, holding the judge up to public ridicule and contempt, there is present an even greater element of unfairness than exists when other public officers are similarly treated. This situation was pointed out by Dean Pound in an address before the American Bar Association in 1926 (Reports A. B. A., vol. LI, p. 764 at 774) as follows:

"* * * While in the period of political transition we subjected our judges generally to popular election, often for short terms, we still retained the common-law tradition that puts the judge upon a different plane from other public officers. While an administrative officer can run up and down the land defending his conduct and can be interviewed in the newspapers with reference to his administrative actions, a judge is supposed, in the language of Mr. Dooley, to comport himself with 'gintlemanly resthraint.' Every sort of argument and every sort of misrepresentation can fill the air and he must sit on the Bench with quiet dignity and administer justice according to law. I think it is a good thing that that is still our tradition. But it does unquestionably subject our administration of justice to some strain. * * *"

It should also be said, we think, to the credit of the press and the newspaper fraternity in general, that they very rarely take undue advantage of the fact that this common-law tradition persists, as we are fully convinced it should persist.

The cases with reference to contempt of court by publication will fall quite naturally into three general classifications, the line of demarcation being sometimes rather indistinct. In the first group are the cases where the publication is charged to be contemptuous because, as the phrase goes, it "scandalizes the courts." In this group will be found publications charging that the administration

of justice has been corrupt; that the court has been prejudiced or has acted from improper motives or "played politics" in its decision; here likewise come the various types of publication abusing the judges or officers of the court, including jurors and grand jurors, and holding them up to public ridicule or contempt. In the second group are contemptuous publications with respect to pending cases. Here will be found publications of libels concerning parties to or witnesses in a pending suit or the attorneys therein; publications of prejudicial matter which could not be introduced in evidence; publications attempting to influence the decision of the court by threats or intimidation, open or covert; publications advising disobedience to court orders, or taking a violent partisan stand upon any question before the court. In the third group are the cases relating to the publication of false, inaccurate, or garbled accounts of judicial proceedings.

 As a matter of social wisdom and of general public welfare, we think it cannot be gainsaid that publications scandalizing the courts or the judges thereof are much to be deprecated. They would seem never necessary or justifiable save perhaps in the rare case of a deliberate and purposeful campaign against a notoriously corrupt judge. The evil of such publications is well stated in a recent article in the California Law Review (vol. XXIV p. 114) as follows:

"Such publications degrade the court, destroy the faith of the people in the courts and their respect for laws, thus making impotent the authority of the courts and endangering the rights of parties in future cases. They also improperly influence the decisions of the courts since the threat of future criticism influences the judges in deciding a case."

In England and in the minority of American jurisdictions such publications are punished as contempts whether they relate to a cause that is pending or to a past case. This court, however, is definitely committed to the majority rule which leaves the judge in such cases to his remedy by civil action or proceeding for libel. State v. Sweetland (1893) 3 S. D. 503, 54 N. W. 415; State v. Edwards (1902) 15 S. D. 383, 89 N. W. 1011; In re Egan (1909) 24 S. D. 301, 123 N. W. 478. We believe that this is the wiser rule as a matter of sound public policy and we purpose to adhere to it.

█ █ Courts universally punish as contempts, in proper cases publications which fall within the second group, being publications which are, in the words of our own former decisions, "calculated to intimidate, influence, impede, embarrass or obstruct the courts in the due administration of justice in matters pending before them." Here several distinctions should be observed. Some courts punish as contempts violent and unfair criticisms of past decisions, not because they scandalize the courts (as most certainly they do), but on the ground that they are likely to embarrass or influence the courts or obstruct the administration of justice in future cases, particularly when such criticisms relate to a type of case that is likely frequently to come before the courts. An instance of this sort is the decision in the case of State v. Shumaker (1927) 200 Ind. 623, 157 N. E. 769, 162 N. E. 441, 163 N. E. 272, 58 A. L. R. 954, holding contemptuous a published report of the Anti-Saloon League criticizing decisions of the Supreme Court of Indiana in liquor cases. As a matter of strict logic (and perhaps as a matter of psychology), a good deal must be conceded to this view. If the decision of a judge is bitterly criticized after he has rendered it, it is hardly to be expected that he can entirely erase that fact from his mind when a few months later he comes to try a very similar case. Perhaps it is salutary that he should not. Doubtless the same thing might be equally true of extravagant praise of his former decision. The matter is very largely one of degree. After all, as characteristically stated by Mr. Justice Holmes in a much quoted dissenting opinion (Toledo Newspaper Co. v. United States [1918] 247 U. S. 402, 38 S. Ct. 560, 62 L. Ed. 1186), "A judge * * * is expected to be a man of ordinary firmness of character." The danger that the administration of justice in future cases will be embarrassed or impeded by criticism of past decisions (even if violent, vituperative and undeserved) is relatively remote and we think it better, as a matter of social policy, that such risk should be taken rather than that the process of contempt should be used in such cases. We believe that any publication, to be punishable as contempt, should be embarrassing or obstructive to the administration of justice in a pending case, and obstructive in fact rather than in theory or by possibility. For an interesting discussion of the matter, see Mr. Thomas' thoughtful little book, previously cited, "Problems of Contempt of Court."

See, also, Fox "The History of Contempt of Court" 1927; and two very interesting articles by Messrs. Nelles and King under the title "Contempt by Publication in the United States" in XXVIII Columbia Law Rev. pp. 401, 525. It follows also from this view that a mere technical pendency of action does not suffice. It must be pending in such a sense and in such a manner that there is still something for the court to do therein, the doing of which may be embarrassed, impeded, or obstructed by the publication complained of.

■ Coming to the third class of publications, false and inaccurate accounts of judicial proceedings, the same test, we think, should be applied and the question should be whether such false and inaccurate account is likely to embarrass or obstruct the administration of justice in an actually pending matter.

We believe that in all contempt cases the distinction should be borne in mind throughout between a merely defamatory publication and an actually obstructive publication. We think the courts should reserve the use of the weapon of contempt for such publications as can fairly and reasonably be said likely in point of actual fact to intimidate, influence, impede, embarrass, or obstruct the court in the due administration of justice in an actually pending matter. And we entertain the opinion that if error is made in either direction in determining that question, it is better and wiser to err in favor of absolute and unrestricted freedom of speech rather than in the other direction.

Without further citation of authority or discussion of the fundamental principles involved, we turn to the application of those principles to the facts of the present case.

■ As to the first publication charged, being the editorial of January 10, it was directed primarily against the activities of counsel for Hasse rather than against the court, although it took occasion to some extent to advise and inform the judge as to his duties. We think it could not possibly be said to have contributed in any helpful fashion to the administration of justice and that it would have been better for all concerned if it had not been published, but, viewed alone, we do not think it should be held to constitute a contempt.

■ As to the news story of February 3 and the editorial of February 4, a closer question is presented. It appears from the

record that the news story was inaccurate and unfair; the editorial passed definitely beyond the bounds of fair and decent comment and criticism and without any justification imputed incompetence or bad motives, or both, to Judge Babcock because of the sentence he imposed in the Hasse case and held him up to ridicule and public disapprobation on account thereof. So far as the Hasse case is concerned, although it was undoubtedly still pending in a technical sense, as a mater of actual and practical fact there was nothing more to be done by the judge or by the court, nor was there possibility of appeal. We think therefore that these two publications cannot be said in any real sense to have been calculated to embarrass or obstruct the administration of justice in the Hasse case. As to the probable effect of these publications upon the other pending cases, particularly the "bridge fraud cases," we think the publications were sufficiently remote therefrom and unconnected therewith so that it ought not to be held that these two publications, considered alone, were calculated or reasonably likely to obstruct the administration of justice in those cases, notwithstanding the fact that the cases were actually pending.

■■ When we come to view the conduct of the defendants in its entirety, as evidenced by their publications over the whole period of time involved, and as indicated not only by the publications specifically charged as contempt but by the other publications introduced in evidence; and when we view the publications upon which the charge is based, not as isolated articles, but as part and parcel of defendants' whole course of conduct (as they undoubtedly were), a still more serious and difficult question is presented.

The defendant corporation and the defendant editor pleaded in their answers that each of these articles was published " in the full belief of their accuracy and propriety, and after having been advised by competent and reputable counsel that they did not, nor did any of them, constitute contempt." We are extremely reluctant to think that if defendants consulted any attorney in this state, they could thereafter retain any honest belief in the propriety of these articles. We think we would be derelict in our duty to the bar of this state if we failed to say that if any member of the bar advised or counseled, or in any manner whatsoever participated in or encouraged these publications, he did so in utter dis-

regard of the ethics of his profession and in flagrant violation of his oath as an attorney. The lawyer better than any one else should know and does know the impropriety of such publications, and better than any one else should know and does know that the proper forum for the trial of causes is the court and not the columns of the press.

Defendants pleaded, as hereinbefore recited, that they had no intent, purpose, or design to attack the integrity of any court or judge or to influence public opinion against any court or judge or bring any court or judge into contempt or disrepute; that they had no purpose, intent, or design to influence, intimidate, or coerce any court or judge or to prevent fair or impartial action by any court or judge. Defendants' entire course of conduct, as exhibited by the whole record, speaks eloquently to the contrary. That defendants did not intend or design to prevent fair and impartial action in pending cases can only be deemed true if it be assumed, as defendants appear to have assumed throughout, that no conduct could by any possibility be deemed fair and impartial save only conduct which met with defendants' entire approval. The trial court specifically found as a fact that the defendants intended precisely what they now plead that they did not intend, and the record amply justifies his finding. Defendants at all times and in all their articles assumed the complete truth of all statements made by the accountant, who was investigating county affairs (and possibly they were right in that assumption as a matter of fact) and the unquestioned guilt of all persons against whom any charges were made or filed as a result of such investigation (and possibly said persons and all of them were guilty in fact). Under our system of government, however, it is essential that criminal charges against all persons be established in a proper manner in a court of competent jurisdiction upon a fair and impartial trial. The defendants by their series of publications attempted to arrogate unto themselves the administration of justice in regard to all these cases. It is unfortunate for any community when this occurs. The judges in this state are elected by the people of the state for the purpose of conducting the courts and administering the judicial department. If they are incompetent or dishonest, they should be replaced. Until they are replaced, it is much to be preferred that they should be permitted

to conduct the affairs of the court without advance advice or assistance or instruction from newspapers, however well intentioned such advice and instruction may be and however competent the editor may be to give it. The public interests will be much better served if the newspaper will permit the courts to conduct pending matters without interference, reserving and exercising fully and freely the right fairly to criticize and comment, in decent and temperate language, when the case is fully concluded. We think no one will be readier to agree with this view than the great mass of able and conscientious newspaper men, who have regard and respect not only for the courts but for the ethics of their own profession. It is, we think, a fortunate thing for the people of this country that the newspapers of the country in general do, as a matter of fact, accept this view and, save in rare instances, conduct their papers accordingly.

This angle of the case, we repeat, is by no means free from doubt. We think the institution of the contempt proceeding by the members of the Brown County Bar was proper and entirely justified. We think the record completely supports the facts as found by the court below, and it must be conceded that there is much and very respectable authority which fully sustains his conclusions and judgment. But nevertheless, partly because we think that defendants were badly advised; partly because we think that defendants really believed that they were acting for the public good in attempting to influence and control the courts concerning these matters in accordance with defendants' own beliefs; partly because we appreciate to some extent, though undoubtedly not fully, the stress of local excitement and feeling at the time of the writing; partly because we realize that it is impossible in point of fact, even if desirable, entirely to insulate the administration of justice from strong feeling existing in a community at the moment; but above all, because we feel that we best promote the public welfare by erring in the decision of so close a question as is here presented (if we err at all, as very possibly we do) in favor of the defendants rather than against them, we are of the opinion that the judgment and order appealed from should be reversed without costs.

POLLEY, P. J., and ROBERTS, RUDOLPH, and WARREN, JJ., concur.