STATE OF MISSOURI at the relation of the PULITZER PUBLISHING COMPANY, a Corporation, Relator, v. FRANK B. COLEMAN, as Judge of Division No. 12 of the Circuit Court of the City of St. Louis, who was substituted for THOMAS J. ROWE, JR. No. 37,053.

Ex parte DANIEL R. FITZPATRICK, Petitioner, v. JAMES J. FITZSIMMONS, Sheriff of the City of St. Louis. No. 37,054.

Ex parte RALPH COGHLAN, Petitioner, v. JAMES J. FITZSIMMONS, Sheriff of the City of St. Louis. No. 37,055.—152 S. W. (2d) 640.

Court en Banc, June 10, 1941.

*J. Porter Henry, John R. Green* and *Jacob M. Lashly* for relator; *Robert D. Evans, Milton I. Goldstein, Hennings, Green, Henry & Hennings* and *Lashly, Lashly, Miller & Clifford* of counsel.

*Jacob M. Lashly, J. Porter Henry* and *John R. Green* for petitioners.

1246

*Franklin Miller, William R. Gentry* and *John L. Gilmore* for respondent Judge; *Louis B. Sher* for respondent Sheriff.

*Victor B. Harris, Ralph F. Fuchs, R. W. Chubb, Glenn L. Moller* and *Luther Ely Smith* for American Civil Liberties Union, Inc., *amici curiae.*

*Jesse W. Barrett* and *Hulen & Sappington* for Missouri Press Association, *amici curiae.*

HAYS, J.—Three original proceedings, growing out of the same subject matter, present identical questions for our decision. In No. 37053—certiorari—the Pulitzer Publishing Company asks us to quash a judgment of the St. Louis Circuit Court finding it guilty of contempt and fining it $2,000. In cases numbered 37054 and 37055 petitioners Fitzpatrick and Coghlan seek release by *habeas corpus* from sentences of imprisonment imposed for the same alleged contempt. Judge Rowe, who tried the contempt proceedings, has died; but in No. 37,053, in which alone he was a party to the record, the cause has been revived against his successor in office.

The facts of the alleged contempt are these: John P. Nick and Edward M. Brady, officers of a union of motion picture operators, were indicted for an alleged extortion from theater exhibitors in St. Louis. It was charged that said defendants, claiming to act for the union but in reality attempting to enrich themselves, demanded increased pay for the union members; that they informed the theater exhibitors that their demand would be withdrawn if they individually were paid $10,000; that the exhibitors, coerced by fear of a strike, met this demand. A similar indictment was returned against Nick and one Weston. Both cases were pending in Division 12 of the Circuit Court. In the first case a severance was granted. Nick's case came on for trial first. The judge *nisi*, finding that the State had failed to produce evidence of two essential elements of the charge, directed an acquittal. Later the Brady case was set. Judge Rowe

called counsel into a pretrial conference. There is no imputation of improper action in connection with this conference. At the close thereof the judge, in open court, asked the circuit attorney whether or not he had any evidence to offer besides that which had been received on Nick's trial. The prosecutor answered that while he had some additional evidence against Brady, the evidence of the State on the two crucial issues of threat and conspiracy would be identical with the proof at the former trial. Thereupon the judge, quite properly, stated that if the evidence were the same he would be forced again to direct an acquittal and suggested that putting on the State's case would involve a needless waste of time and money. The circuit attorney then entered a *nolle prosequi*. At that time the Nick and Weston case had not yet been reached for trial on the docket.

Relator Pulitzer Publishing Company owns and operates the St. Louis Post-Dispatch. Coghlan is an editor of that paper and Fitzpatrick a cartoonist. On the day following the dismissal of the Brady case, the following editorial was written by Coghlan and published in the paper:

"A Burlesque on Justice

"THE AMAZING CASE OF PUTTY NOSE, a legal skit in one very short act, presented under the auspices of the State of Missouri, in association with the people of St. Louis, in Circuit Court, Criminal Division, with the following cast: Putty Nose . . . State Representative Edward M. Brady; Putty Nose's First Lawyer . . . Sigmund M. Bass; Putty Nose's Second Lawyer . . . Paul Dillon; Circuit Attorney . . . Franklin Miller; Assistant Circuit Attorney . . . Robert Y. Woodward; His Honor, the Judge . . . Thomas J. Rowe, Jr.; Noise (off stage) . . . John P. Nick.

"An utterly unconvincing performance was given in the court of Circuit Judge Thomas J. Rowe, Jr. yesterday in the latest fiasco in the John P. Nick-Putty Nose Brady $10,000 extortion trials. Presumably it was a serious presentation, but those hardy spectators who gathered in the hope that drama of some proportions would unfold saw what fell little short of a burlesque on justice.

"Notwithstanding the makings of a lively play and a notable cast of characters, there was nothing to hold the audience's interest. There was little action, and all there was merely brought the performance to an abrupt and untimely end.

"Only two players had parts of prominence. After a behind-the-scenes prologue in the judge's chambers in which all the principals participated, the first and only act opened before Judge Rowe's bench. The jury had not yet been selected, although 30 veniremen had been called. The Circuit Attorney and counsel for the defendant announced ready.

"With that, the Judge asked the Circuit Attorney if he had any further evidence which would show a conspiracy between John P. Nick, who did not appear on the stage although a member of the cast, and Putty Nose. This referred to evidence submitted by the Circuit Attorney in the Nick trials, the fourth of which was cut off when Judge Rowe ordered a verdict of acquittal last January. The Circuit Attorney said that he would present some additional evidence which he could not present in the Nick case, as Putty Nose and Nick were not billed together in the earlier trials.

"But the Circuit Attorney indicated that he thought the evidence on the two 'essential elements of conspiracy and threat' was sufficient for his case. At any rate, he said he was ready to try Putty Nose on the evidence he had.

"The performance was now moving swiftly to its unforeseen end. 'Then,' said the Judge, 'there is not further evidence to prove the essential elements of this indictment. The Court will be inclined to sustain a demurrer at the end of the case, the Court having ruled in the Nick case that the State failed to prove the essential elements of the charge.'

"Thereupon the Judge suggested that the state dismiss the case to 'save the unnecessary expense of a useless trial,' the Prosecuting Attorney accepted the recommendation, and the curtain fell like a shot.

" 'The Amazing Case of Putty Nose' raises questions which many spectators will want answered. In explaining his ruling in the fourth Nick trial—the ruling which kept the case of the movie union racketeer from the jury—Judge Rowe said that it was a close question which he had to decide. If the decision was as difficult as that in the Nick case, was he justified then in stopping the Putty Nose case when he was assured that evidence would be presented which could not be presented in the Nick case? Might he not have let the case be heard and then have decided on the facts as presented in court, as he did in the Nick case?

"His answer to that last question was that it was foolish to put the state to the expense of a useless trial. This would bear more weight if courts and lawyers in Missouri had made a practice of showing concern for the cost of trials and criminal prosecution. It makes little impression on all who know the lawyers regularly invoke the costly rule of severance for defendants in criminal trials and that Judges, who could be an influence in ridding Missouri criminal procedure of this automatic waste of time and money.

"As for Sigmund Bass and Paul Dillon, cast as Puttynose's No. 1 and No. 2 lawyers, what they did not do in view of the audience was more notable than what they did. For it will be remembered that  they played Nick's counsel in the earlier productions. In those roles, they were confronted with testimony of Fred Wehrenberg that he

and two other theater owners paid Puttynose $10,000 at the Jefferson-Gravois Bank on the day Nick signed the old wage-scale contract for the movie operators.

"As Nick's counsel, Messrs. Bass and Dillon said in effect that the Puttynose affair was none of their business. Puttynose might have gone to the theater owners and asked them for money, he might have 'conned' them out of their $10,000 ('conned' was Actor Dillon's word), but 'Nick was out of the picture.' Had 'The Amazing Case of Puttynose' been a full-length drama, with the case going to the jury, the audience inevitably would have seen Messrs. Bass and Dillon put in the position of having, on the one hand, to reconcile their readiness in the Nick case, to dump the blame on Puttynose with, on the other hand, their defense of Puttynose yesterday. Perhaps these masters would have reached new heights in character acting.

"Franklin Miller, in the role of Circuit Attorney, read his lines in his usual ham-actor manner. He might have electrined the audience as a fighting protector of popular rights, but not once did he show so much as a spark of fire. In fact, he yielded so easily that it is doubtful if he realized how abjectly he was defeated.

"The statute of limitations shuts Miller off from bringing a re-indictment and an attempt to produce a full-length play with a successful climax. But statute of limitations or no, that would have been most unlikely, to judge by the long record of dismal flops in his 11 years on the Market street Rialto."

A slightly different but substantially similar version of this editorial appeared in another edition of the paper. On the next day Coghlan wrote and the company published a second editorial which was as follows:

"Judge Rowe: Turn 'em Loose. Judge Oakley: These Men are Guilty!

"Did ever rulings in the Circuit Court of St. Louis on two successive days stand out in sharper, starker, more astounding contrast?

"Monday gave us that burlesque on justice. 'The Amazing Case of Putty Nose,' in the court of Judge Thomas J. Rowe, Jr. Yesterday, we had justice which was the real article in the court of Judge Ernest F. Oakley.

"One day, law and order are made a laughing stock. The next day, in another court room, the force of the law strikes with lightning-like retribution.

"No case, said Judge Rowe. No case against Putty Nose, just as there was no case against John P. Nick.

"Oh, Nick might be a known racketeer. He might be a thug who ruled the movie operators' union through coercion and strong-arm methods. He and Putty Nose might have teamed together in a shake-down. They might have stung the movie theater operators before the old wage scale for operators was extended. Payment of $10,000

to Putty Nose might have been testified to under oath. Yet no case. No case against Nick. No case against Putty Nose.

"No case at all—that was what Judge Rowe said. So, having kept Nick's case from going to the jury, he now stopped Putty Nose's trial before a jury could be selected. No use finding out how Putty Nose's lawyers could defend him after having put the blame for the $10,000 payment on Putty Nose when they defended Nick. No case. No use. Putty Nose and Nick go free on criminal charges.

"But the law has another side. It has a civil side. On this side, union members, striving energetically to clean house, are suing Nick to recover funds for the union. A case? There is nothing remotely resembling doubt in Judge Oakley's decree. He finds that through Putty Nose, Nick secretly received $10,000 paid by the theater men to Putty Nose. He orders Nick to pay the union $10,000, and Nick and Clyde Weston, the union's business agent, together to produce $38,000. A case? Well, rather!

"No case, Nick and Putty Nose, said Judge Rowe. Go free.

"Cough up, says Judge Oakley. That money isn't yours. Pay it into the treasury of the men you sold out. Pay up and get out and take with you all your henchmen and the 'known criminals' you smuggled into the union. Disgorge! Clear out!

"A case? Yes and no. No, if you are in criminal division before Judge Rowe. If you are in civil division before Judge Oakley, yes— emphatically yes!"

In the same edition of the paper appeared a cartoon drawn by Fitzpatrick purporting to represent a burlesque theater in the city slums and entitled "Burlesque House in Rat Alley." The sign on the marquee of the theater is "10 grand gone with the wind," and some of the remarks apparently coming from the theater are: "Ladies an' gents, this performance opens wit' th' blessings of th' law an' th' courts;" and "Ain't severance wunnaful—" While one member of the waiting crowd is represented as saying: "Who does th' strip tease?" and another replies "Nick does th' strip an' Putty Nose does th' tease."

Shortly after these publications the circuit attorney filed information charging relator, the two petitioners and another with contempt. It alleged the facts above summarized and charged that the publications scandalized the court and interfered with the pending case of State v. Nick and Weston. All four respondents filed returns to the citation. Reese, a co-respondent, not now involved in the case, denied all knowledge of or participation in the publications. The other returns admitted the publications of the editorials and cartoon, denied that they referred to the case of State v. Nick and Weston, denied that they charged the judge with corruption or partiality and set up certain constitutional defenses to be hereafter noted. The State asked for judgment on the pleadings and the cause came on to

1254

be heard. The trial judge inquired if any of the parties desired to offer evidence and was told that they did not. After an extended argument on the law he took the case under advisement and several days later entered judgment discharging Reese and finding the others guilty of contempt.

Briefs filed by counsel for the relator, the petitioners, the respondents and the *amici curiae* are voluminous, exhaustive and most helpful to the court. The number of authorities therein cited is vast. The analysis thereof is thorough and its extent is in proportion to their number and importance. To discuss all of them would extend this opinion far beyond reasonable bounds. We are forced, therefore, to confine ourselves to what we deem the essential legal questions in the case, applying to them what we consider sufficient determinative and governing authorities.

■ Relator and petitioners contend that at the hearing below they were denied procedural due process in that the trial court prejudged their case before their returns were filed and before they could present arguments as to the law. That such prejudgment would violate the requirements of the due process clause was expressly held by this court in Ex parte Nelson, 251 Mo. 63, 157 S. W. 794. We reaffirm what we there said. The record of this case, however, is wholly dissimilar to that in the Nelson case. Great stress is placed upon the form of the citation issued by the trial court. It is said that that document on its face showed that the court, in issuing it, determined in advance the guilt of the respondents below. Some of the language used therein is unfortunate, but we would not be justified in inferring that the court actually prejudged the case. Such inference is clearly negatived by the record. The citation itself gave the respondents below a right to file return. They were offered an opportunity to introduce evidence which they refused to take. They were permitted to present arguments as to the law and at the close of these arguments the trial court took the case under advisement considering it for several days before rendering a decision. In its judgment the court exonerated one of the original respondents and found the rest guilty. This is not a case in which the judge definitely predetermined the issues but reserved the right to change his mind after hearing. On the face of the record it appears that his determination was not reached at all until after hearing and that he gave to the arguments then adduced full and due consideration.

■ It is next argued that relator and petitioners were denied procedural due process in that they were not tried by a jury. The due process clause of the Fourteenth Amendment to the Constitution of the United States (Sec. 1) does not require a jury trial, but other methods of trial may be lawfully provided by a state. [Walker v. Sauvinet. 92 U. S. 90, 23 L. Ed. 678; Chicago, Rock Island & Pacific Ry. v. Cole, 251 U. S. 54, 40 Sup. Ct. 68, 64 L. Ed. 133.]

■ It is said, however, that the Constitution of this State guarantees the right to jury trial to persons charged with contempt. This contention runs contra to the settled practice of many years. We are now asked to declare this practice invalid and the argument pressed upon us is purely historical. It may be summarized as follows: Section 28 of Article II of our present Constitution provides: "The right of trial by jury, *as heretofore enjoyed,* shall remain inviolate." This provision has been brought forward through various revisions from our earliest fundamental law. [Const. of 1865, Art. I, Sec. 17; Const. of 1820, Art. 13, Sec. 8.] The organic laws of Missouri prior to 1820 were contained in an Act of Congress approved June 4, 1812 (1 Territorial Laws 8). That act contained what was in effect a bill of rights in which is found the following (1. c. 13): "No man shall be deprived of his life, liberty, or property, but by the judgment of his peers *and* the law of the land." Congress in translating the foregoing from Magna Charta varied its language in one respect. The phrases "judgment of his peers," and "the law of the land" are joined by the conjunction "and" and not by the conjunction "or." It is therefore contended that under the Act of 1812 each citizen had a right to a jury trial in any case in which he was in in peril of deprivation of life, liberty or property. It is said that the Constitution of 1820 perpetuated this right in its full scope.

This argument disregards the facts of history. For hundreds of years prior to 1820 equity cases had been tried by a chancellor without a jury. Yet our first constitutional convention provided in Section 1 of Article V that the judicial power of the State should be vested "in a supreme court, *in a chancellor,* in circuit courts," etc. The intent of the convention to perpetuate the then existing system of equity trials is clear. From that time on equity cases continued to be tried without juries and none of our four succeeding constitutional conventions attempted to change this practice. Prior to 1820 certain legal proceedings, for example those relating to extraordinary writs, were also tried without a jury. Each of our constitutions has specifically vested in the courts the right to issue such writs. None has attempted to impose expressly the requirement of jury trial. It is plain, therefore, that the right to trial by jury, guaranteed by the Constitution, is the right as it existed at common law, and that it is limited to those cases in which common-law procedure required or permitted such a trial. Without discussing at present how far the power to punish for contempt extended under the common law, we will observe that in these instances where its existence is unquestioned the procedure involved was that of a trial by the judge without a jury. [12 Am. Jur. 429; Beale, Contempt of Court, 21 Harv. Law Rev. 161.] We, therefore, hold that the right to trial by jury did not exist in the present case.

1256

The ultimate question in these cases is whether or not the acts admittedly done by the relator and the petitioners constitute a contempt of court summarily punishable. It is contended that these publications did constitute such contempt for two reasons: (1) that they tended to scandalize and bring into disrepute the court; (2) that they interfered with the still pending case of State v. Nick and Weston. These must be separately considered.

■ We are not dealing with so-called civil contempt; that is, with an act which is wrongful merely because it constitutes disobedience to an order or decree of the court. The power of a court to imprison a recalcitrant litigant under those circumstances is exercised to coerce obedience and not to punish him. That such power is of ancient origin and is an essential and inherent part of judicial power can scarcely be denied. (Beale, Contempt of Court, supra.) Nor are we dealing with the court's power to punish direct criminal contempts—acts done in the very presence of the court which obstruct or interfere with the peaceful and orderly functioning of the tribunal. We are dealing with what is called a constructive or indirect contempt. Does the publication of an article which refers to a case already closed but which tends to scandalize and bring into disrepute the judge deciding such case constitute a contempt which the court has power to punish?

■ Counsel have discussed at length the origin of the power to punish for contempt. Is it statutory or constitutional? In State ex inf. Crow v. Shepherd, 177 Mo. 205, 76 S. W. 79, 99 Am. St. Rep. 624, this court specifically held that the power is derived from the Constitution. It is part of the inherent judicial power of the courts (Sec. 1, Art. VI, Const. of Mo.). The Shepherd case was cited with approval on this point in State ex rel. C., B. & Q. Railroad v. Bland, 189 Mo. 197, 88 S. W. 28 and in C., B. & Q. Railroad v. Gildersleeve, 219 Mo. 170, 118 S. W. 86, 16 Ann. Cas. 749. In the latter case a minority composed of WOODSON, GRAVES and LAMM, JJ., dissented. The dissenting opinion clearly recognizes the constitutional origin of the contempt power, but holds that the Legislature may properly limit the extent of punishment to be imposed up on a contemnor. The case of In re Clark, 208 Mo. 121, 106 S. W. 990, 15 L. R. A. (N. S.) 389, also recognizes that the power to punish for contempt is inherent. In Ex parte Creasy, 243 Mo. 679, 148 S. W. 914, we had before us the question of whether or not a sentence for contempt which exceeded the statutory limits then existing (Sec. 3882, R. S. 1909) was valid. We held that it was not and that while the contempt power came from the Constitution, we would, out of respect for the opinion of a co-ordinate branch of the government, recognize legislative limits to the punishment to be imposed upon a contemnor. Speaking of the Shepherd and Gildersleeve cases we said: "Let those cases be overruled to the extent indicated in the dissenting

opinion in the Gildersleeve case." Again, in In re Ellison, 256 Mo. 378, 165 S. W. 987, In re Howell and Ewing, 273 Mo. 96, 200 S. W. 65, Ex parte Le Mond, 295 Mo. 586, 245 S. W. 1057, Noell v. Bender, 317 Mo. 392, 295 S. W. 532, and Thompson v. Farmers' Exchange Bank, 333 Mo. 437, 62 S. W. (2d) 803, we expressly approved what was said in the Shepherd case with regard to the origin of the contempt power.

The judicial power granted to the courts by the Constitution is the power to perform what is generally recognized as the judicial function—the trying and determining of cases in controversy. It includes those incidental powers which are necessary and proper to the performance of that function. The power to punish civil contempts, as above defined, is, for example, necessary to the existence of a court of equity, and the power to punish as contemnors those who actively interfere with the functioning of any court is equally necessary for its existence.

Furthermore, at the time when our Constitution of 1820 was adopted, the right to punish for contempt in certain cases was universally recognized to be a part of the judicial power. Chancery courts from an early date had enforced their decrees by imprisoning recalcitrant litigants until they were ready to obey. (Beale, Contempt of Court, supra.) Sir John Fox in his book entitled "Contempt of Court" has shown that direct criminal contempts were punished by courts of law through summary procedure from an early date. In this connection he cites (pp. 50, 51) Y. B., 33-5 Edw. I, 316; Y. B., 31 Henry VI, p. 10, pl. 5, and numerous other cases. Early American cases recognized the existence of this power (The United States v. Hudson, 7 Cranch, 32; 3 L. Ed. 259; United States v. Smith, Fed. Cas. No. 16,342; In re Yates, 4 Johns. (N. Y.) 317; State v. Johnson, 1 Brev. (S. C.) 155; Mariner v. Dyer, 2 Me. 165). Later adjudications are collected and commented upon in the Annotation in 121 A. L. R. 215. We, therefore, adhere to 'what we said in the Shepherd case as modified by Ex parte Creasy.

█ Since the power to punish for contempt is of constitutional origin, we must answer two questions in regard to the class of publications here considered. First, did such publications constitute punishable contempt of court at common law prior to 1820? Second, is the power to punish them necessary and proper to safeguard the functioning of the court as a judicial tribunal? In the case of State ex inf. Crow v. Shepherd, supra, we said that such publication did constitute contempt. The publication there involved referred to the Oglesby case, 177 Mo. 272, 76 S. W. 623. published in the same volume with the Shepherd case, 177 Mo. 205, 76 S. W. 79, and charged this court with venality in deciding that case. The record disclosed that when the Shepherd case was decided the Oglesby case was still pending on motion for rehearing. The elaborate argument in the Shepherd case

to prove that a publication scandalizing the court was punishable as contempt is based upon a misunderstanding of legal history. The English authorities cited are comparatively recent ones. They start with an opinion prepared by Mr. Justice WILMOT in Rex v. Almon, Wilmot, Notes and Opinions, 243. One Almon had published a pamphlet in which he viciously attacked certain rulings of Lord Mansfield in the Wilkes case after determination of that proceeding. A citation was issued against Almon and after the hearing Wilmot prepared a decision of the court finding him guilty of contempt. Before judgment, however, it was discovered that the case had been wrongly entitled and the proceeding was dismissed. Some years later the Wilmot opinion was published. It contained an elaborate argument to prove that a publication of this character was punishable as contempt. As is well known, Wilmot and Sir William Blackstone were close friends and the former to some extent collaborated with the latter in connection with his famous commentaries. Wilmot's opinion seems, therefore, to be the foundation of Blackstone's statement as to the contempt power (Blackstone's Commentaries, Book IV, ch. 20, Sec. 3). Later English cases followed and applied the rule as we did in the Shepherd case. More exhaustive historical research in recent years has proved that Wilmot was wrong and that the power he claimed had never been exercised by the common-law courts, but only in a few instances by the court of Star Chamber (Sir John Fox, Contempt of Court, ch. 2; Frankfurter and Landis, Power to Regulate Contempts, 37 Harv. Law Rev. 1010; Nelles and King, Contempt by Publication in the United States, 28 Columbia Law Rev. 401). The great weight of judicial authority now supports the proposition that a publication, however scandalous concerning a case which has been closed, is not punishable as a contempt. [Patterson v. Colorado, 205 U. S. 454, 51 L. Ed. 879; Craig v. Hecht, 263 U. S. 255, 44 Sup. Ct. 103, 68 L. Ed. 293; State ex rel. Metcalf v. District Court, 52 Mont. 46; State ex rel. Attorney General v. Circuit Court (Wis.), 72 N. W. 193; In re Egan (S. D.), 123 N. W. 478; Storey v. People, 79 Ill. 45, 22 Am. Rep. 158; Van Dyke v. Superior Court (Ariz.), 211 Pac. 576; Nixon v. State (Ind.), 193 N. E. 591; State v. American-News Co. (S. D.), 266 N. W. 827.]

The reason why a direct interference with a pending case is punishable is obvious. The trial cannot be stopped while another jury is impaneled and the interferers prosecuted criminally or sued civilly. The court must have the power to quickly and in a summary fashion enforce its orders and prevent acts which would hinder and delay the proceedings before it. But in the case of a publication having reference to a closed case, these reasons do not exist. (Beale, Contempt of Court, supra.) We, therefore, hold that since the power to punish for criticism of the court in regard to a past case did not exist at common law, and since it is unnecessary as a safeguard to the proper

functioning of the court as a judicial tribunal, such publications do not constitute punishable contempt.

But it is also contended by the relator and the petitioners that even though a publication relates to a case still pending in court and constitutes a direct personal and vindictive criticism of the conduct of the court in such case, it cannot constitute contempt. With this we do not agree. The correct rule is stated by the late Chief Justice TAFT in his concurring opinion in Craig v. Hecht, 263 U. S. l. c. 278, 44 Sup. Ct. l. c. 107, 68 L. Ed. l. c. 300, as follows:

"If the publication criticizes the judge or court after the matter with which the criticism has to do has been finally adjudicated . . . the publication is not contempt. . . . If, however, the publication is intended and calculated to obstruct and embarrass the court in a pending proceeding in the matter of the rendition of an impartial verdict, or in the carrying out of its orders and judgment, the court may, and it is its duty to protect the administration of justice by punishment of the offender for contempt."

It is said that this rule violates the constitutional guaranty of freedom of the press (Sec. 14, Art. II, Const. of Mo.; Amendment 14, Const. of the U. S.). The right of freedom of the press is only a specific instance of the general right of freedom of speech enjoyed by all. Persons engaged in the newspaper business cannot claim any other or greater right than that possessed by their fellows. The right of freedom of speech is one of the fundamental safeguards of democratic government. Its recognition distinguishes the governments of the English-speaking nations from those now in power in Europe. It is the duty of this court to zealously safeguard this guaranty of liberty against undue encroachment. Yet, the right is not absolute and unlimited. [Cooley, Constitutional Limitations, (7 Ed.), p. 605.] The interest of society in the spread of truth is made possible by untrammeled discussion, and this is most important. But there are other social interests such as the preservation of order and the right of litigants to a fair trial and a decision based solely on the law and the evidence, which are equally important; and a balance between these interests in case of conflict must be struck (Chaffee, Freedom of Speech, 34). The freedom of speech provisions of the Constitution, for example, do not grant immunity to one who speaks slanderous words of his neighbor, nor prevent the punishment of one who solicits another to commit a crime. In the same way they do not give any privilege to utter or publish words which directly interfere with the orderly processes of a court in administering justice in a pending case. Publication of personal and unreasoned criticism of a court before which a case is pending often tends to substitute trial by newspaper for trial by the court and jury, and would tend to bring about a decision based upon the momentary whim of a publisher or the

desires of the mob rather than one based upon the law and the evidence.

On the other hand, it is true that judges are human beings; that at times ignorant and corrupt men may secure places upon the bench. Under our form of government judges are elected or at least hold their places subject to the approval of the people at an election. Therefore, the judge cannot be immune from criticism. The people who must pass upon his continuance in office have a right to be informed of his weakness, venality, or inefficiency. But, such information can clearly be given to them through comment on his actions in closed cases without attempt, through criticism of his conduct in pending cases, to intimidate him or interfere with his unbiased decisions. The power to punish for contempt has always extended to acts done in the presence of the court which tend to interfere with the trial of a pending case (Sir John Fox, Contempt of Court, pp. 51, 52). And the necessity to prevent such interference may be just as great where the obstructing act occurs out of the presence of the court. For example, we have held in In re Ellison, 256 Mo. 378, 165 S. W. 987, that an attempt to intimidate or bribe a juror out of the presence of the court may be punished as a contempt. There is no valid distinction to be drawn between such an act and a personal criticism of the judge with respect to his conduct in a pending case which has a direct tendency to bring about a decision in accordance with the desires of the critic rather than one based upon the law and the evidence.

The question which confronts us now is whether or not the publications here involved referred to or interfered with the case of State v. Nick and Weston. The determination of the meaning and intent of an alleged newspaper article is a matter of law to be decided by the courts. [Dale v. State (Ind.), 150 N. E. 781; 17 C. J. S., sec. 85, p. 120.] A careful reading of the first two editorials shows that neither of them mentions the case of State v. Nick and Weston, nor does the cartoon refer to it. As to the last editorial published on March 6th: While this article does, in one instance, mention Clyde A. Weston, its language is couched in the past tense, which leads us to the belief that it can only refer to the concluded cases against Nick and Brady and the concluded civil case of Robinson v. Nick and Weston. True, Nick was a party to both criminal cases and the issues involved were similar. But, if right to criticize a closed case is to be denied simply because a case involving a similar issue is still pending, it would be so greatly curtailed as to be valueless. Nor can the simple fact that the same party appears in both cases be determinative. Sometimes a large number of cases are filed against one defendant. Could it be contended that a writer must wait until the last of these cases was decided before uttering any criticism of the decision in the first? A careful reading of the editorials and a careful

consideration of the cartoon leads us to the view that they did not directly interfere with or influence the case of State v. Nick and Weston, but were leveled exclusively at the concluded Nick-Brady cases and not at the pending criminal charges against Nick and Weston. In such a stuation as this, where it has been contended that the criticism of court action in a concluded matter might adversely affect another action pending, the cases have rejected the contention. [Ex parte Craig (C. C. A. N. Y.), 274 Fed. 177; Cheadle v. State (Ind.), 11 N. E. 426; Nixon v. State (Ind.) 193 N. E. 591; State v. American-News Company (S. D.), 266 N. W. 827; State v. Kaiser (Ore.), 23 Pac. 964.]

█ It is said that the Brady case was still pending at the time of these publications. This contention is based upon the theory that the trial court might during the term set aside the *nolle prosequi* and reinstate the case on the docket. In State v. Lonon, 331 Mo. 591, 56 S. W. (2d) 378, we held that such a power did exist in the trial court. But this holding does not necessarily mean that after a case has been dismissed it is still to be considered pending during the entire term at which the order of dismissal was made within the meaning of the contempt rule above set out. There are intimations to that effect in Ex parte Nelson, 251 Mo. 63, 157 S. W. 794, but we are convinced that that is not the law. [Scheibler v. Steinburg (Tenn.), 167 S. W. 866; Lizotte v. Dloska (Mass.), 86 N. E. 774.] To rule otherwise would be to narrow the limits of permissible criticism so greatly that the right to criticize would cease to have practical value.

It is our conclusion that in case number 37053, the judgment of the circuit court should be quashed; that in case number 37054, the petitioner should be discharged; and that in case number 37055, the petitioner should be discharged. It is so ordered. All concur; *Douglas, J.,* in separate opinion in which *Ellison, J.,* concurs.

## SEPARATE CONCURRING OPINION.

DOUGLAS, J., concurs, but is of the opinion that "scandalizing the court itself," as an institution, is contempt against which a court has the power to protect itself in the interest of the public, a principle heretofore approved by this court in State ex inf. v. Shepherd; and for such reason disagrees with so much of the majority opinion which may be construed to deny this power or to overrule State ex inf. v. Shepherd as to this principle. *Ellison, J.,* concurs.